**LOCAL UNION NO. 1992, OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS**

v.

**THE OKONITE COMPANY, Appellant**

No. 98–6194.

United States Court of Appeals, Third Circuit.

Argued May 19, 1999.

Decided Aug. 17, 1999.

Richard J. DeLello (Argued), Grotta, Glassman & Hoffman, Roseland, NJ, for Appellant.

Paul A. Montalbano, Ronnie Gardstein (Argued), Schneider Goldberger Cohen Finn Solomon Leder & Montalbano, Kenilworth, NJ, for Appellee.

Before: BECKER, RENDELL, and ROSENN, Circuit Judges

## OPINION OF THE COURT

RENDELL, Circuit Judge.

Appellant The Okonite Company ("Okonite") appeals from the order of the District Court granting summary judgment in favor of appellee Local 1992 of the International Brotherhood of Electrical Workers ("Local 1992") on appellee's claim that appellant violated the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101–09, by failing to give its employees sufficient advance notice of a plant closing. The District Court held that any waiver of these claims in exchange for severance benefits was invalid for lack of consideration, because appellee union members had been entitled to such benefits without executing the waiver, under the unambiguous terms of their severance agreement. We find that the District Court erred in holding that the severance agreement was unambiguous, and will reverse and remand for further proceedings consistent with this opinion.

## I.

Appellant Okonite is a manufacturer and seller of high voltage wire and cable. In January 1995, Okonite employed 209 employees at its North Brunswick, New Jersey facility, 160 of whom were represented by appellee Local 1992. As demand for its product decreased, Okonite was forced to lay off a substantial number of employees between January 1995 and May 1996. Okonite's economic problems persisted, and in June 1996, it decided it could no longer continue production at the North Brunswick facility. Okonite announced its intention to close the North Brunswick facility on July 8, 1996, and twenty-one employees were laid off effective that date. Over the next nine months, the remaining employees were laid off, [1] and the plant was closed on March 31, 1997.

The employees' entitlement to benefits after the plant was closed was governed by the severance agreement contained in the collective bargaining agreement between Local 1992 and Okonite. All but one of the employees elected severance payments; he was laid off with a right of recall or transfer to another Okonite facility through May 17, 2001. The vast majority of those who elected severance pay had fifteen or more years of service with Okonite, and therefore received between thirteen and seventy-eight weeks of severance pay. Employees who chose to receive severance benefits were required to execute a severance computation form that provided:

> I understand that by accepting severance pay I will be deemed to have waived all my rights as an employee, excluding only those rights or benefits to which I may have become entitled to under any Pension, Welfare or other benefit program established by the Company which I may have been eligible to participate in.

On July 11, 1996, Local 1992 filed a grievance against Okonite, alleging that Okonite had violated the collective bargaining agreement by terminating employees without prior notice. Okonite denied the griev-

---

1. Additionally, between January 1, 1995 and March 31, 1997, 19 employees were transferred to other plants, 16 retired, one was terminated for cause, one voluntarily quit, and one passed away.

ance, and Local 1992 filed the instant suit in the District Court, alleging that Okonite had violated the WARN Act by failing to provide sixty days advance notice to employees laid off when the plant closed on July 8, 1996, and by failing to provide sixty days advance notice to employees laid off during "mass layoffs" between January 1, 1995 and July 8, 1996. The District Court granted Okonite's motion to dismiss the latter allegation, finding that, during the relevant time period, there had not been any "mass layoffs" that required advance notice. This determination has not been challenged on appeal.

The District Court also found that appellee had not waived its first claim, in spite of the waiver language in the severance computation form. The Court determined that the employees had not received any enhanced benefit in exchange for agreeing to waive their rights, because, under the unambiguous terms of the severance agreement, the employees were already entitled to the severance benefits they received in exchange for signing the severance computation form. The Court noted:

> "By signing the Severance Form, the Bargaining Unit Employees received nothing other than that to which they were already entitled. Accordingly, valid consideration does not exist to support the release language of the Severance Form."

The District Court then granted summary judgment in favor of appellee on this claim, finding that the employees who had been laid off beginning July 8, 1996 and ending September 6, 1996 had not received the requisite WARN notice, and were therefore entitled to sue for damages. The Court also denied appellee's request for prejudgment interest, and granted its request for attorney's fees. Appellant filed the instant appeal. We exercise our appellate jurisdiction pursuant to 28 U.S.C. § 1291. The District Court had jurisdiction based on 28 U.S.C. § 1331 and 29 U.S.C. § 2104(a)(5).

## II.

The District Court's summary judgment ruling was based on its determination that the terms of the severance agreement were unambiguous, and entitled appellee union members to severance benefits prior to signing the waiver form, thereby rendering such waiver invalid for lack of consideration. The question of whether contract terms are clear or ambiguous is a legal one subject to plenary review. *See Pennbarr Corp. v. Insurance Co. of N. Am.,* 976 F.2d 145, 149 (3d Cir.1992). We will affirm a grant of summary judgment on an issue of contract interpretation only if we conclude that the contractual language is subject to only one reasonable interpretation. *See Tamarind Resort Assocs. v. Government of the Virgin Islands,* 138 F.3d 107, 110–11 (3d Cir. 1998); *Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc.,* 81 F.3d 328, 332 (3d Cir.1996); *Pennbarr Corp.,* 976 F.2d at 149.

We turn first to the language of the severance agreement in order to determine if the District Court properly held that it was unambiguous. The portions most relevant to our analysis are paragraphs two, three, and four:

2. Employees will be eligible for severance pay as herein provided if they are involuntarily terminated as the result of a permanent transfer of machinery, equipment, or operations to other plants of the Company, due to the permanent cessation of such work at the North Brunswick Plant or in the event of a total plant shutdown.

3. An employee involuntarily terminated and eligible for severance pay in accordance with the foregoing shall, within the time limits herein established, elect one of the following options:

(a) Layoff with such recall rights as he may be entitled to under the collective bargaining agreement then in existence between the parties.

(b) Severance pay in accordance with the foregoing, in which case such employee will be deemed to have waived all of his rights as an employee, excluding any rights or benefits to which he may have become entitled under any Pension, Welfare, or other benefit program established by the Company in which he may have been eligible to participate. In the event such employee is rehired at a later date by the Company, he shall be rehired as a new employee.

(c) The time, measured from the date of termination of employment, within which an employee may make such election shall be as follows:

| Completion of Full Years of Work | Time Within to Make Election |
|---|---|
| 5 | One (1) Month |
| 10 | Two (2) Months |
| 15 | Three (3) Months |
| 20 | Four (4) Months |

Any employee failing to notify the Company of his election within the time limits established herein shall be deemed to have elected in favor of the first option referred to above—layoff with retention of recall rights.

4. In the event of a total plant shutdown, employees who are laid off at the time of such shutdown, or who have as of the date of such shutdown been laid off within six (6) months prior to the date of the announcement of a total plant shutdown, and who retain recall rights under the collective bargaining agreement shall be deemed to have been involuntarily terminated as the result of such plant shutdown and shall be entitled to severance pay.

App. 102–03. The District Court examined these provisions and concluded that, under the plain meaning of the agreement, employees who were involuntarily terminated as a result of a total plant shutdown were automatically entitled to severance pay under paragraph four, and were not required to proceed under paragraph three, which would have required them to elect either severance pay or recall rights,

and waive their rights as employees if they chose severance pay. In interpreting these provisions, the District Court noted that the severance agreement did not explicitly provide that paragraph three did not apply to total plant shutdowns, and when read in isolation, paragraph three could be read as applying to both partial and total plant closings. Nonetheless, the Court concluded, when paragraph three was read in conjunction with paragraph four, which was explicitly limited to total plant shutdowns, it was clear that paragraph three applied only if there was a partial plant closing, and not if there was a total plant shutdown.

The District Court also concluded that the language in paragraph four that employees "shall be entitled" to severance pay indicated that employees' eligibility for severance pay after a total plant shutdown was not conditioned on a waiver of their rights. Thus, appellee union members, as employees involuntarily terminated as a result of a total plant shutdown, were entitled to severance benefits under paragraph four of the agreement, and any waiver of their rights in exchange for these benefits they were already entitled to was void for lack of consideration. *See Williams v. Phillips Petroleum Co.*, 23 F.3d 930, 935–36 (5th Cir.1994) (requiring adequate consideration for release of a WARN Act claim); *see also Ponzoni v. Kraft General Foods, Inc.*, 774 F.Supp. 299, 313 (D.N.J. 1991) (requiring consideration for release of claims); *Mullen v. New Jersey Steel Corp.*, 733 F.Supp. 1534, 1545–46 (D.N.J. 1990) (holding that plaintiff's receipt of benefits he was not otherwise entitled to, in exchange for release of claims, was consideration for release). The District Court also noted that its interpretation of the severance agreement was "further supported by the absence of any conflicting extrinsic evidence."

Both parties contend on appeal that the agreement is unambiguous, but offer conflicting interpretations. Appellee advocates the District Court's interpretation,

arguing that the only reasonable interpretation of the agreement is that appellee union members' entitlement to severance benefits under paragraph four was not conditioned on a waiver of their rights, and that the waiver was therefore ineffective because there was no consideration to support it. Appellant proposes an alternative interpretation, arguing that the District Court erred in holding that paragraph three of the severance agreement applied only to partial plant closings, and that, when paragraphs two and three are read together, it is clear that paragraph three also applies to total plant closings so that a waiver of other claims is a condition to severance.[2] Paragraph four, appellant urges, was not intended to provide unconditional entitlement to severance benefits in the event of a total plant shutdown, but, instead, to enlarge the class of employees eligible for severance pay under paragraph three to include employees who were laid off at the time of the total plant shutdown, or who were laid off within the six-month period prior to the announcement of the total plant shutdown. The language in paragraph four providing that employees will be "entitled" to severance pay, appellant contends, can be interpreted as meaning that these additional employees will be "eligible" to receive severance pay if they agree to the terms provided in paragraph three, i.e., if they choose severance pay, they must waive their rights as employees. Furthermore, appellant notes, the choice provided in paragraph three is not meaningless in the context of total plant shutdowns; although employees obviously could not be recalled to the plant that is shut down, they do retain rights to be transferred to another Okonite facility.[3] In

fact, as appellant notes, one employee who did not timely submit his election to receive severance pay was placed on layoff status and given a right of recall through May 17, 2001 via intra-company transfer, in accordance with paragraph three.

■ We believe that the District Court erred in holding that its interpretation of the severance agreement was the only reasonable one, and we find that appellant's interpretation of the agreement is equally plausible. In determining whether contractual language is ambiguous, courts should consider the contract language, the proffers of the parties, and the extrinsic evidence offered in support of each interpretation. See In re New Valley Corp., 89 F.3d 143, 150 (3d Cir.1996). The District Court relied primarily on the language of the severance agreement in making its determination, finding that the explicit language of paragraph four trumped paragraph three, and focusing on its view (as well as the dictionary's) of the definition of "entitle" in paragraph four. The District Court did not refer to any basis in the record for its conclusion, other than noting that there was no extrinsic evidence contrary to its interpretation, and listing the materials it reviewed in making its determination in a footnote at the beginning of its opinion. App. 471–72 n. 3. We do not believe that the meaning of the language in the agreement is as clear as the District Court concluded, and find that additional factors should be considered in interpreting its terms.[4]

First, the District Court determined that paragraph four, and not paragraph three, applies to total plant shutdowns,

---

2. We note that, although our dissenting colleague discusses the breadth of the waiver itself, we do not address that issue, as the District Court did not reach that issue and the parties did not argue it on this appeal.

3. The agreement regarding intra-company transfer provides in relevant part: "The Company agrees that any employee who has been involuntarily terminated as a result of a Plant shutdown and who notifies the Company that

he or she is available for employment at any of the Plants set forth herein, shall be given first consideration for any job opening." App. 96.

4. We note that the District Court is not prevented from entering summary judgment on remand if it relied upon, although it did not refer to, persuasive evidence establishing that its interpretation was the only reasonable one.

because paragraph four, and not paragraph three, specifically references total plant shutdowns. However, the introductory language to paragraph three can reasonably be interpreted in a way that casts doubt on its conclusion that the provision clearly does not apply to total plant shutdowns. Paragraph three applies to employees "involuntarily terminated and eligible for severance pay in accordance with the foregoing." The "foregoing" refers to paragraph two, which reads:

> Employees will be eligible for severance pay as herein provided *if they are involuntarily terminated* as the result of a permanent transfer of machinery, equipment, or operations to other plants of the Company, due to the permanent cessation of such work at the North Brunswick Plant or *in the event of a total plant shutdown.*

App. 102–03 (emphasis added). Therefore, paragraph three appears to include a total plant shutdown as one of the "foregoing" events, suggesting that paragraph three would apply in such a situation.

Second, the District Court held that the use of the word "entitle" in paragraph four signified an absolute right to severance benefits in the event of a total plant shutdown, rather than the right to elect benefits in exchange for the waiver of rights provided for in paragraph three. Paragraph four reads:

> In the event of a total plant shutdown, employees who are *laid off at the time* of such shutdown, *or* who have as of the date of such shutdown been *laid off within six (6) months prior* to the date of the announcement of a total plant shutdown, *and who retain recall rights* under the collective bargaining agreement *shall be deemed to have been involuntarily terminated as the result of such plant shutdown* and *shall be entitled* to severance pay.

App. 103 (emphasis added). Paragraph four can just as easily be read as defining who "shall be deemed to have been involuntarily terminated as the result of such

plant shutdown" and therefore "entitled" to elect severance under paragraph three. It could be said that the purpose of paragraph four is to enlarge the class of employees eligible to choose under paragraph three, not only to those who are laid off at the time of the total plant shutdown, but also to those who were laid off within the six previous months (some of whom may have previously made a different election under paragraph three). Further, the use of the word "entitle" does not necessarily mean that the employees provided for under paragraph four would be entitled to severance without giving whatever waivers might be required; it can be interpreted to mean that, having previously exercised an option for layoff with recall rights, they are entitled to the opportunity, once the plant has been totally shut down, to choose again, under paragraph three. Appellant has made a plausible argument that this provision is intended to prevent an employer from avoiding severance obligations by effectively laying off most employees over several months, then shutting down with a skeleton crew.

It could also be important in determining the meaning of paragraph three to consider whether the recall option provided by its terms has meaning in the event of a total plant shutdown, in light of the agreement providing for intra-company transfer upon total plant shutdown. Are these transfer rights commensurate with the recall rights of paragraph three? We do not know whether the District Court considered this factor, or any other factors as to the practical effect or implementation of these provisions, in evaluating the agreement. If it did, it is not apparent on the face of its ruling, which, as we note above, relies solely on the language of the agreement.

Because the severance agreement is susceptible of two reasonable interpretations, the District Court erred in holding that the agreement clearly and unambiguously provided that appellee union members were entitled to severance benefits without

the requirement that they waive all claims, and in determining, as a result, that the waivers were invalid for lack of consideration. Accordingly, we will reverse the grant of summary judgment and remand for further proceedings in light of this opinion.

ROSENN, Circuit Judge, dissenting.

Plaintiff Local 1992 of the International Brotherhood of Electrical Workers ("Local 1992" or "the Union") and defendant, The Okonite Company ("Okonite"), both argue that the severance agreement that they bargained for is unambiguous. The District Court held that the contract was unambiguous. Because in my opinion there is only one reasonable interpretation of the severance agreement, I agree. Unlike the District Court, however, I believe that Okonite advances the only reasonable interpretation—employees waived their rights to sue Okonite as a condition of receiving severance pay. Therefore, I respectfully dissent.

## I.

Okonite permanently closed its manufacturing plant in North Brunswick, New Jersey on March 31, 1997. In accordance with the severance provisions contained in the collective bargaining agreement ("CBA") between Okonite and the Union, Okonite paid the union members whom it permanently terminated. When closing the plant, Okonite did not give thirty-six of them the sixty-day notice of termination prescribed by the Worker Adjustment Retraining and Notification Act ("WARN Act" or "the Act"), 29 U.S.C. §§ 2101–2109.

Okonite manufactures and sells high-voltage wire and cable. On January 1,

1995, it employed 209 people at its North Brunswick plant. Facing decreased demand for its products, Okonite laid off sixty-eight workers in 1995 and another twelve between January and May 1996. Because sales continued to suffer, Okonite determined by the end of June 1996 that it could not continue production at the plant. On July 8, 1996, it notified the Union that it was closing the North Brunswick plant. Okonite laid off twenty-one workers immediately and the remaining workers gradually until March 31, 1997, the date it permanently shut down the plant.[5]

Based on length of service, the union members actively employed on the closing date received two to four months' time to elect whether to accept severance benefits. Those who elected to take them, and all but one did, signed a severance computation form. The form included the following release:

> I understand that by accepting severance pay I will be deemed to have waived all my rights as an employee, excluding only those rights and benefits to which I may have become entitled to under any Pension, Welfare or other benefit program established by the Company which I may have been eligible to participate in.

(S.A.137). This waiver provision parallels the language used in paragraph 3(b) of the severance agreement. See Maj. Op. at 341.

Local 1992 and Okonite have entered into collective bargaining agreements since 1957. They first bargained for the severance agreement in 1965. Since 1975,[6] the severance provisions remained fundamentally unchanged after each successive renewal of the CBA, including the CBA that

---

**5.** Okonite laid off sixty bargaining unit employees after July 8, 1996. Between January 1, 1995, and March 31, 1997, it transferred nineteen employees to other plants and terminated one employee for cause. During that time period, sixteen employees retired with severance benefits, one employee resigned, and one employee died.

**6.** With the enactment of the Employment Retirement Income Security Act (ERISA), the parties modified the severance provisions of July 1975 to exclude pensions and welfare benefits from the waiver of employee rights.

took effect on February 7, 1994, and was in force at the time Okonite closed the North Brunswick plant.

In the six collective bargaining agreements negotiated since 1975, the Union has reaffirmed the severance provisions. No substantive changes were made in the severance agreement after the passage of the WARN Act in 1989. The employees electing to receive severance pay signed the release as a condition of its receipt. Those receiving severance pay waived all of their rights as employees and Okonite paid a total of $1,183,398.10 to eighty-two employees under the severance agreement (S.A.143–224). The Union, however, is now seeking by this action an additional $216,656 in wages for thirty-six employees who were laid off prior to the expiration of the sixty-day notice period provided by the WARN Act. The Union also seeks attorneys' fees, interest, and costs. (S.A.234, S.A.515).

## II.

Severance benefits are not a matter of right for dismissed employees under state or federal law. The right to severance pay generally arises out of collective bargaining, as it did in this case, and its purpose is to provide "a form of compensation for the termination of the employment relation for reasons other than the employee's gross misconduct, primarily to alleviate the consequent need for economic readjustment." *Owens v. Press Publ'g Co.,* 20 N.J. 537, 120 A.2d 442, 446 (1956). Although one of the objectives of severance pay, sometimes known as dismissal compensation, is to ease the employee's financial burden while searching for new employment, severance pay is also "[p]artial compensation for loss of seniority rights, loss of pension rights; compensation for retraining or acquiring new skills; and many others." *Ackerson v. Western Union Tel. Co.,* 234 Minn. 271, 48 N.W.2d 338, 342 (1951); *see Dismissal-Pay Provisions in Union Agreements, 1949,* 70 Monthly Labor Review 384 (1950). Thus, severance benefits serve the same purpose as notice of termination of employment.

Depression-era criticisms of employers' control over the employees' prospects for continued employment, and thus over employees' economic security, prompted the advent of severance payments in American labor relations. *See* Ralph Weber, *Severance Pay, Sales of Assets, and the Resolution of Omitted Cases,* 82 Colum. L.Rev. 593, 595–96 (1982). Periodically, employers devised severance plans to compensate employees who lost their jobs due to plant closings. *See* Everett D. Hawkins, *Dismissal Compensation* 27 (1940). Most often, employers made severance payments merely to substitute for the failure to give salaried employees customary notice of layoff. *See id.*

Beginning in the 1940s, labor unions began seeking, and often won, collectively bargained severance agreements. *See Dismissal-Pay Provisions in Union Agreements, supra,* 70 Monthly Labor Review at 384; *see also In re Public Ledger,* 161 F.2d 762, 771 (3d Cir.1947) (discussing effect in bankruptcy of severance agreement employer and union entered into as part of collective bargaining agreement in 1940). Because of mergers and the reduction of newspaper publishers and similar merger activity in the railroad industry following the Great Depression, as well as the effect of the development of television on commercial radio, severance clauses became popular in the printing, newspaper, railroad, and communications industries. *See Dismissal-Pay Provisions in Union Agreements, supra,* 70 Monthly Labor Review at 384–85. In fact, 201 of 202 collective bargaining agreements between the American Newspaper Guild and newspaper publishers in December 1949 contained severance provisions. *Id.* at 385.

Severance plans have permitted employers to fix the costs of layoffs or plant closings.

Severance pay in essence serves as a liquidated damages clause, compensat-

ing an employee for the breach of an agreement, implicit in the employment relationship, that he will hold his job as long as he performs well. As a liquidated damages clause, severance pay substitutes for post-breach calculations of loss in individual cases.

Weber, supra, 82 Colum. L.Rev. at 597 (footnote omitted); *see also Wanhope v. Press Co.*, 256 A.D. 433, 10 N.Y.S.2d 797, 799 (1939) (considering severance pay to be liquidated damages for dismissal), *aff'd*, 281 N.Y. 607, 22 N.E.2d 171 (1939).

The waiver requirement contained in the severance agreement in this case can be seen as a liquidated damages clause that permits Okonite to fix the costs of layoffs and relieve itself of any liability under the WARN Act.

Thus, Okonite and the Union, by providing for severance benefits in their collective bargaining agreements, long anticipated the objectives of the WARN Act. Here, all union members in this litigation were eligible for severance pay. The purpose stated by the Act for requiring sixty days advance notice to each representative of employees affected by a plant closing or mass layoff, is to provide employees and their families "some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a).

Recognizing that collective bargaining agreements or possibly state laws already may have provided for similar protection for terminated employees, the Act's implementing regulations specifically provide that its provisions do not supersede any laws or collective bargaining agreements that provide for additional notice or additional rights and remedies. 20 C.F.R. § 639.1(g). Collective bargaining may be used to fulfill or amplify the terms or conditions of the Act. *Id.*

The title of the WARN Act offers insight into the purpose of the statute—a purpose anticipated by the severance agreement. The unabbreviated title is "The Worker Adjustment Retraining and Notification Act." An important aspect of the severance benefits that Okonite agreed to provide was compensation based on the employee's length of service with Okonite. All but one union member that was laid off after Okonite's shutdown announcement elected to accept, in accordance with the service schedule, between thirteen and seventy-eight weeks' pay. In exchange, they gave individual releases of all claims against Okonite, except for certain specified exclusions referred to above. This severance pay far surpassed any wages they would have received under the WARN Act and satisfied the objective of the law. The severance package provided benefits that increased with years of service with the Company and ultimately reached two weeks of pay for every year of service over twenty-five.[7]

Thus, the severance pay not only provided money to ease an employee's burden upon permanent termination of employment but it accomplished two other important benefits not provided by the WARN Act. First, the Company paid the severance in a lump sum, not weekly over the sixty day notification period. Second, it enabled the employee to retrain or seek

---

7. The severance benefits under the agreement were:

1. Severance pay will be paid to employees involuntarily terminated as hereinafter set forth in accordance with the following schedule:

| Number of Full Years of Continuous Employment | Weeks of Severance Pay |
| --- | --- |
| 5 | 6 |
| 10 | 8 |
| 15 | 13 |
| 20 | 17 |
| 25 and over | 2 weeks per year of service |

A week of severance pay shall be forty (40) hours of pay at the employee's base rate which base rate shall include the employee's "payroll add" but shall not include shift bonus, or incentive earnings.

new employment immediately without working during the running of the purported sixty-day notification period. Moreover, it rewarded the terminated employee by increasing his benefits for his years of service with Okonite. Thus, I believe that the payment of the severance benefits to each terminated employee upon the closing of the plant fulfilled the purpose of the WARN Act and no further notice under it was required.

Furthermore, the agreement gave options to a permanently terminated employee eligible for severance benefits. He did not have to take severance pay immediately or at all. The length of time available for his election also depended upon his length of service with the Company. See Maj. Op. at 341–42. (S.A.374) In exchange for these benefits, the employee is "deemed to have waived all of his rights as an employee," excluding benefits to which he may be entitled under any pension, welfare or other benefit program established by the Company. If the employee elected not to take severance benefits, then notice under the Act was required.

In this litigation, with one exception, each employee elected to receive his contractually bargained severance benefits. (S.A.375) Though its members received the severance pay, the Union now seeks in behalf of its terminated members to avoid the releases signed by each of them, and obtain wages, *inter alia*, for sixty work days following their terminations. The Union contends that the severance payments made by Okonite to its employees terminated by the plant closing cannot be considered payments in lieu of the WARN Act notice. Moreover, it argues that, despite each employee's written waiver and release, the employee received nothing more than what he was entitled to contractually. Therefore, the Union asserts that there was no consideration to support the employees' waiver of their rights to notice under the WARN Act and for the release of claims executed by each employee.

## III.

The requirement that employees sign a release as a condition of receiving severance pay is a common provision in modern severance agreements. "An employee release is a contract in which a discharged employee abandons claims against a former employer after they have arisen, in exchange for benefits such as severance pay." 2 Henry H. Perritt, Jr., *Employee Dismissal Law & Practice* § 8.10 (3d ed.1992); *accord* West Group, *Employment Coordinator* ¶ PM–16,603 (1994) ("A release clause states the employee's promise not to sue the employer, its agents, or its affiliates based on claims arising out of the employment relationship."). A recent Bureau of National Affairs ("BNA") publication recognized that severance plans often include a provision requiring employees to release "the employer from employment-related liability claims" as a condition to receive severance benefits. 10 *Collective Bargaining Negotiations & Contracts* 1702 (1998). A BNA survey reported that in 1985 twenty-three percent of employers, and twenty-eight percent of manufacturing companies, with severance plans required terminated employees to sign a release in exchange for receiving severance benefits. Personnel Policies Forum, *Severance Benefits & Outplacement Services* 8 (1986). The inclusion of a release clause in the sample separation agreement printed in the *Employment Coordinator* illustrates the ordinary usage of waiver requirements in severance plans. *See Employment Coordinator,* supra, at ¶ PM–16,612.

An employee's release of all claims against his employer relating to his employment can validly waive his rights under the WARN Act. *See Williams v. Phillips Petroleum Co.,* 23 F.3d 930, 935–36 (5th Cir.1994); *Tobin v. Ravenswood Aluminum Corp.,* 838 F.Supp. 262, 269–70 (S.D.W.Va.1993). Federal common law governs whether the employees who signed the release validly waived their

rights to sue under the WARN Act, a federal statute. *See Town of Newton v. Rumery*, 480 U.S. 386, 392, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987). Accordingly, a waiver must be knowing and willful. *Coventry v. United States Steel Corp.*, 856 F.2d 514, 521–22 (3d Cir.1988) (citing *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 52, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)). In addition, the employee must receive consideration in exchange for the waiver. *See, e.g., Wagner v. NutraSweet Co.*, 95 F.3d 527, 532 (7th Cir.1996). The Union does not argue that the waiver was not knowing and willful; it asserts, however, that the employees received no consideration for waiving their WARN Act rights to notice. Whether the employees in fact received consideration in exchange for executing the releases hinges on the terms of the severance agreement.

## IV.

In analyzing the Union's claim, we view the interpretation of the severance agreement and its provisions *de novo. Pennbarr Corp. v. Insurance Co. of N. Am.*, 976 F.2d 145, 149 (3d Cir.1992); *Bradwell v. GAF Corp.*, 954 F.2d 798, 800 (2d Cir. 1992). In our examination of the severance provision of the CBA between the parties to this dispute, "the attendant circumstances and the objects they were striving to attain are necessarily to be regarded. In a word, the judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose." *Owens*, 120 A.2d 442, 445 (1956) (citation omitted). "Moreover, a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). "In construing contracts and other written agreements, the court must, if possible, ascertain and give effect to the mutual intention of the parties." *Hudson County Newspaper Guild*, 93 A.2d at 187. We must construe the contract as a whole. *See, e.g., Vanguard Telecomms., Inc. v. Southern New England Tel. Co.*, 900 F.2d 645, 651 (3d Cir.1990). When examining the instant severance agreement in its entirety, it unambiguously provides that any eligible employee who elects to accept severance pay thereby waives all rights against the employer, except for the special exclusions.

Paragraphs 2 and 3 of the severance agreement define the eligibility requirements for severance pay. Paragraph 2 of the severance agreement provides that employees "involuntarily terminated as a result of . . . a total plant shutdown" are "eligible for severance pay." Paragraph 3 begins: "An employee involuntarily terminated and eligible for severance pay in accordance with the foregoing shall, within the time limits herein established, elect one of the following options." The phrase "in accordance with the foregoing" in Paragraph 3 incorporates Paragraph 2's proviso that an employee laid off due to a plant shutdown is eligible for severance pay. Paragraph 3 gives the terminated employee certain options including the option of recall rights or severance pay. If he elects the latter, he is "deemed to have waived all of his rights as an employee," except for certain specific exclusions. Paragraph 4 provides that employees who were laid off within six months prior to the date of the announcements of a total plant shutdown who retain recall rights are "entitled to severance pay." The severance provisions form an integrated agreement, each paragraph related and all but the first paragraph dependent upon another.

As the majority notes, the District Court agreed with the Union and held that the employees had not waived their right to the sixty days notice, despite the waiver language in the severance agreement and the release each employee executed. In entering summary judgment for the Union, the District Court concluded that the terms of the severance agreement unam-

biguously entitled the Union member employees to severance benefits prior to signing the waiver form, regardless of the sums of money paid by the Company for them. This, the Court held, rendered the waivers invalid for lack of consideration.

Specifically, the District Court concluded that employees who were involuntarily terminated as a result of the total plant shutdown were automatically entitled to severance pay under paragraph 4 of the severance agreement. The Court distinguished paragraph 4's provision that a laid-off employee "shall be entitled to severance pay" from paragraph 2 and 3's declaration that involuntarily terminated employees are "eligible for severance pay" and concluded that paragraph 4 created an absolute right to severance pay and paragraphs 2 and 3 established a conditional right to severance pay. The Court determined that the provisions of paragraph 4, but not paragraphs 2 and 3, apply to employees involuntarily terminated as a result of a total plant shutdown. To give effect to paragraph 4, the Court stated without explanation that paragraph 3 "must be read as only applying when a partial plant shutdown transpires." (S.A. 500) As noted above, the District Court further held that the releases and waiver of rights executed by each of the employees were void for lack of consideration.

In reaching its result, the District Court undertook a strained reading of the text and ignored the parties' intent as well as the history and purpose of severance benefits. The court cabined off paragraph 4 of the severance agreement, isolated it from the rest of the severance provisions, and treated it as a complete and independent contract. This paragraph, however, by context and number, cannot be read reasonably as a separate, free-standing contract, or as a provision trumping the preceding paragraphs. It is part and parcel of the entire, integrated severance package and, as such, was subject to the eligibility and waiver provisions set forth in the previous paragraphs. The Court disregarded

paragraphs 2 and 3 of the severance agreement on the arbitrary supposition that they applied exclusively to partial closings and applied paragraph 4 solely to a total closing of the plant.

There is no reasonable, logical, textual, or historical basis for this construction. The only reasonable construction of the contract applies the same meaning to the phrases "eligible for" and "entitled to." The key words are defined similarly. "Entitle" is defined as "to furnish with proper grounds for seeking or claiming something." *Webster's New Collegiate Dictionary* 377 (1979 ed.). The same dictionary defines "eligible" as "qualified to be chosen" and lists "entitled" as a synonym of "eligible." *Id.* at 366. *Webster's Third New International Unabridged Dictionary* primarily defines "eligible" as "fitted or qualified to be chosen or used; entitled to something." *Webster's Third New International Dictionary, Unabridged* 736 (1993 ed.). *Burton's Legal Thesaurus* includes "eligible" as a synonym for "entitled." *Burton's Legal Thesaurus* 202 (1980).

In addition, defining "entitled to" and "eligible for" differently, so that the entitlement would be unqualified and the eligibility would be conditional, renders the severance agreement internally contradictory. Under an interpretation with disparate definitions, paragraphs 2 and 3 would require employees laid off due to a plant closing to waive their rights as employees in order to receive severance pay, and paragraph 4 would permit those employees to collect severance pay while retaining their rights. A court should not construe a contract in a manner that creates an inconsistency. *See Mastrobuono*, 514 U.S. at 63, 115 S.Ct. 1212.

Furthermore, the District Court's construction would lead to the incredible conclusion that a terminated employee with only one year of service or less would be entitled to severance benefits on the total shutdown of that plant. This was never the intention of the parties, for length of

service with the Company is of prime concern in the eligibility provisions of the severance agreement, *see Dismissal–Pay Provisions in Union Agreements, 1949, supra*, 70 Monthly Labor Review at 387, as paragraph 3 makes clear.

Construing "entitled to" and "eligible for" similarly does not reduce paragraph 4 to mere surplusage. The paragraph vests employees laid off in the six-month period prior to the announcement of a plant closing with the same rights as employees laid off during a plant closing.

The historical and contractual purpose of severance benefits is not to compensate employees on the basis of a partial or total shutdown of a plant; its purpose is to provide dismissal pay for an employee permanently terminated from employment involuntarily, unless the termination is caused by the employee's misconduct. Severance payments are triggered on involuntary permanent termination. Whether the plant is partially or totally closed or even remains open are incidental events, but the critical factor generating the right to severance benefits is the termination of employment for eligible employees.[8]

The primary purpose of paragraph 4 is to bring under the severance pay umbrella certain employees who are laid off by totally shutting down the plant, or who have been laid off within six months of the shutdown and have recall rights. There is nothing in paragraph 4 that would except these employees, or any other employees receiving severance benefits, from the waiver and eligibility provisions of the severance agreement. No possible justification or reasonable explanation can be offered to differentiate between employees permanently terminated by a partial shutdown or a total shutdown in waiving claims against an employer if they elect to receive and are paid full severance benefits. Common sense compels a contrary conclusion.

The CBA between the Union and Okonite contains a commonplace severance agreement. As a quid pro quo for an agreement to provide severance compensation upon involuntary permanent termination of employment, the employer has required a waiver of all the employee's rights against it, except for the specific exclusions. If an employee has rights or claims against the employer at time of termination, which in his opinion are superior to the value of the severance benefits, he can elect not to accept the severance benefits. "Because severance benefits are contingent and unaccrued," *Bradwell*, 954 F.2d at 801, an employee can always reject them if he has claims against the employer that are deemed of greater value.

The decisive factors in triggering severance benefits are the involuntary termination and eligibility. The severance provisions are carefully built on these pillars. One cannot reasonably read paragraph 4 of the severance agreement without considering the prior paragraphs which prescribe the rules of eligibility for severance.

The Union argues that, according to paragraph 3(b) of the severance agreement, the only right employees accepting severance pay waive is the right of recall. In my opinion, the Union's proffered construction is unreasonable. The text of paragraph 3(b) provides that an employee accepting severance pay "will be deemed to have waived all of his rights as an employee." The Union's narrow construction of the waiver clause conflicts with the clause's broad, general language and would render the waiver clause surplusage.

By choosing severance pay, an employee obviously relinquishes his recall rights. No separate waiver clause is necessary to make clear that an employee receiving severance pay surrenders his right to recall.

---

8. Conceivably, a company may keep its plant open, yet permanently terminate employees because it has chosen to discontinue manufacturing and engage in a totally different business, such as television or publishing. For example, Westinghouse Manufacturing Company gave up its extensive manufacturing operations, switched to national broadcasting, changed its name to CBS, and continues as an operating company.

Moreover, Local 1992's construction is inconsistent with the structure of paragraph 3. Paragraph 3(a) does not state that an employee who elects recall rights waives his right to severance pay. Consequently, it would be illogical for paragraph 3(b) to pronounce that an employee who elects severance pay waives his right to recall. Thus, I do not agree with the District Court's and the majority's conclusion that the Union's proffered construction of the severance agreement was reasonable. *See Irwin v. Globe–Democrat Publ'g Co.,* 368 S.W.2d 452, 457 (Mo.1963) ("We have no right, in interpreting a collective bargaining agreement, to say that by the use of words and phrases which have well-defined and commonly understood meanings in the field of labor relations the parties did not mean what they said. We cannot interpret such an agreement as we may think it should have been written.").

The Union contends that it would be senseless for employees laid off as a result of a plant closing to have the choice between recall rights and severance pay because recall rights have no value after a plant closing. However, between January 1, 1995 and March 31, 1997, the Company transferred nineteen employees to other plants. *See supra,* n. 1. Because a laid-off employee could use his recall rights to transfer into a different plant, it is not unreasonable to construe the severance agreement to provide employees laid off due to a plant closing with the right to choose between recall rights and severance pay. Furthermore, the employee could also elect not to take severance pay and stand on his rights under the WARN Act or any other claim he might have.

Accordingly, the severance agreement gave employees laid off in a plant closing a conditional right to severance pay. To satisfy the condition, and thereby transform their right to severance pay into an absolute right, eligible employees were obliged to waive their rights against Okon-ite, including the right to sue their former employer. The release contained on the severance computation form implemented the waiver required by the severance agreement.

By signing the release, as nearly every employee did, and thus fulfilling the condition for receiving severance pay, the employees laid off in the plant closing gave consideration for Okonite's payment of severance benefits. Of course, satisfaction of a condition precedent can be consideration for a benefit conferred. *Stopford v. Boonton Molding Co.,* 56 N.J. 169, 265 A.2d 657, 664 (1970) (holding employee's satisfaction of conditions precedent constituted consideration for pension benefits). More fundamentally, the execution of a release is consideration for severance pay. *Hughes v. Cornhusker Cas. Co.,* 235 Neb. 656, 456 N.W.2d 765, 768 (1990); *see also Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 428, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998) (recognizing release of all claims in exchange for severance pay may be enforceable if not violative of statutory provision); *cf. Griffith v. Melbourn,* 245 Ark. 40, 430 S.W.2d 862, 863 (1968) (holding promise not to protest discharge was consideration for severance pay). Because the release signed by the employees was, in addition to being knowing and willful, supported by consideration, it should be enforced. *See Williams,* 23 F.3d at 935–37 (enforcing release signed in exchange for severance benefits and affirming summary judgment for employer on WARN Act claim). *Tobin,* 838 F.Supp. at 270 (enforcing release signed in exchange for severance benefits and granting summary judgment for employer on WARN Act claim against employees who signed releases but not against employees who did not sign releases).[9]

## V.

In sum, it is my opinion that the District Court erred in granting summary judg-

---

**9.** Additional recent decisions enforcing a release in exchanges for severance pay and barring suits against the employer include *Uherek v. Houston Light & Power Co.,* 997 F.Supp. 789, 794 (S.D.Tex.1998) (enforcing release signed in exchange for severance pay and barring plaintiff's Title VII and state-law claims), and *Nail v. Brazoria County Drainage*

ment for Local 1992 on the first count of its complaint. I agree with the majority's conclusion that Okonite's proffered construction of the severance agreement was reasonable; however, I cannot agree with the majority that the severance agreement is ambiguous. I believe that the severance agreement unambiguously requires any eligible employee who elects to accept severance benefits to waive his right to sue his employer for damages under the WARN Act. The monies paid the employee who accepts severance pay is consideration for the waiver. Moreover, the severance benefits Okonite paid to the terminated employees fulfilled the purpose of the WARN Act. Thus, I do not believe the Act required Okonite to give them notice. Remanding this case for further proceedings is inappropriate. I would reverse, rather than vacate, the District Court's judgment, and remand the case with direction to enter judgment for the Company. I, therefore, respectfully dissent.

*Dist. No. 4,* 992 F.Supp. 921, 924 (S.D.Tex. 1998) (enforcing release signed as consideration for de facto severance agreement and barring plaintiff's federal claims).