

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-9-2006

# Local 827 v. Verizon NJ Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-4706

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Local 827 v. Verizon NJ Inc" (2006). *2006 Decisions.* Paper 602.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/602

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————

No. 04-4706

—————

LOCAL 827 INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, AFL-CIO;
VIRGINIA J. FISHER; FREDERICK D. MAZZARO;
RICHARD F. EICHEL; LAWRENCE COOPER

v.

VERIZON NEW JERSEY, INC.;
VERIZON SERVICES CORPORATIONS;
VERIZON INCOME SECURITY PLAN
FOR MID-ATLANTIC ASSOCIATES

Verizon New Jersey, Inc; Verizon Services Corporations,

Appellants

—————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 02-cv-1019)
District Judge: Honorable Robert B. Kugler

——————

Argued January 25, 2006

Before: RENDELL and STAPLETON, Circuit Judges
and POLLAK,* District Judge.

(Filed August 9, 2006)

———————

*Honorable Louis H. Pollak, Senior District Judge for the United States District Court
for the Eastern District of Pennsylvania, sitting by designation.

Nicholas J. Sanservino, Jr.
Thomas M. Beck    **[ARGUED]**
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C.  20001

Mary B. Rogers
Pitney Hardin
P.O. Box 1945
Morristown, NJ 07962
    *Counsel for Appellants*

Mark E. Belland    **[ARGUED]**
Steven J. Bushinsky
O'Brien, Belland & Bushinsky
2111 New Road, Suite 101
Northfield, NJ 08225
    *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

POLLAK, <u>District Judge</u>.

Verizon[1] and its employees, represented by Local 827, entered into a Collective Bargaining Agreement ("CBA") for the purpose of regulating certain work-related issues. Article VII, Section 1 of that CBA contemplates the process by which employee benefits packages are offered when Verizon determines that a workforce surplus exists.  In March

---

[1] Defendants-Appellants Verizon New Jersey, Inc., Verizon Services Corporation, and Verizon Income Security Plan for Mid-Atlantic Associates are collectively described as "Verizon."

of 2002, Local 827 and a number of Verizon employees brought this suit under the Labor Management Relations Act and the Employee Retirement Income Security Act. The plaintiffs assert that Verizon breached the CBA by making benefit offers to surplus employees in a manner inconsistent with Article VII, Section 1. Both sides moved for summary judgment on all claims. In an opinion issued November 23, 2004, the District Court agreed with Local 827's interpretation of the CBA, granted partial summary judgment to the plaintiffs, and enjoined Verizon from interpreting the CBA in a manner inconsistent with the court's opinion. Verizon now brings this interlocutory appeal. We agree with the District Court's construction of Article VII, Section 1 of the CBA and will affirm.[2]

## I. Overview

Plaintiff Local 827 represents the non-supervisory employees at Verizon New Jersey, Inc. On October 27, 2000, Local 827 and Verizon entered into a CBA, which, *inter alia*, provides for the procedure to be followed in the event that Verizon declares a surplus of employees exists in its workforce. Specifically in issue is the process by which benefit offers are made to employees in a non-layoff context when a surplus has been identified by Verizon. The relevant section of the CBA, Article VII, Section 1, reads:

> 1. If during the term of this Agreement, the Company notifies the Union in writing that technological change (defined as changes in equipment or methods of operation) has or will create a surplus in

---

[2] 28 U.S.C. § 1292(a)(1) confers our jurisdiction over this appeal.

any job title in a work location which will necessitate layoffs or involuntary permanent reassignments of regular employees to different job titles involving a reduction in pay or to work locations requiring a change of residence, or if a force surplus necessitating any of the above actions exists for reasons other than technological change and the Company deems it appropriate, regular employees who have at least one (1) year of net credited service may elect, in the order of seniority, and to the extent necessary to relieve the surplus, to leave the service of the Company and receive Income Security Plan (ISP) and if applicable, during the term of this Agreement, Enhanced Income Security Plan (Enhanced ISP) benefits described in this Section, subject to the following conditions.

(a)     The Company shall determine the job titles and work locations in which a surplus exists, the number of employees in such titles and locations who are considered to be surplus, and the period during which the employee may, if he or she so elects, leave the service of the Company pursuant to this Section. Effective until August 2, 2003, the Companies will offer Enhanced ISP in the circumstances described in Section 2 (a) of this Article and may also offer Enhanced ISP in other circumstances if they choose to do so. The Companies may limit acceptances to the number of surplus and this Enhanced ISP offer would be in lieu of obligations, if any, the Companies may have to offer regular ISP. Neither such determinations by the Company nor any other part of this Section shall be subject to arbitration.

(b)     The number of employees who may make such an election shall not exceed the number of employees determined by the Company to be surplus.

(c)     An employee's election to leave the service of the Company and receive ISP or Enhanced ISP payments must be in writing and transmitted to the Company within thirty (30) calendar days from the date of the Company's offer in order to be effective and it may not be revoked after such thirty (30) calendar day period.

Verizon argues that the above language describes a system by which the directors

4

and managers of Verizon's various internal "work groups" identify surpluses within the work groups they manage at a work location.[3] Once a surplus has been declared within that work group, Verizon claims that Income Security Plan (ISP), and, where applicable, the Enhanced Income Security Plan (EISP), is offered to all employees who are both within the work group and who have the job title identified to be in surplus. If more employees within a work group accept this offer than there is surplus, the employees with the most seniority receive the benefits until the surplus no longer exists. Verizon states that this system has the practical effect of Verizon offering ISP/EISP to fewer than all of the employees with the same work title at a work location because there are typically many work groups operating at a work location.

Verizon also offers evidence extrinsic to the CBA that it believes supports its interpretation. The company notes that from 1990 until 2001, it has operated its ISP/EISP program for non-layoff employees in the manner described above without complaint from Local 827. Verizon further claims that Local 827 was aware of the way the ISP/EISP program was being administered because the company sent a letter to the union each time a surplus was identified and an ISP/EISP offer made. Between 1990 and 2001, approximately thirty such notices were sent to Local 827.

Local 827 argues that Article VII, Section 1 is not ambiguous in requiring Verizon

---

[3] The term "organization," an apparent synonym for "work group," is also in use; for clarity's sake, only the term "work groups" will be employed in this opinion.

to offer ISP/EISP benefits in non-layoff situations to all employees who have the same job title and are employed at the same work location. The union argues that the plain language of the CBA supports its understanding, and that any other reading would substantially undercut the contractually conferred seniority rights of Verizon employees when ISP/EISP offers are made. Moreover, the union argues that the extrinsic evidence presented by Verizon does not create ambiguity in the plain meaning of the contractual language.

For the reasons given below, we agree with Local 827's position and conclude that Article VII, Section 1 of the CBA is without ambiguity in its language limiting Verizon to making non-layoff ISP/EISP offers to all employees that have the same job title and are employed at the same work location.

## II. The Contractual Language

We undertake a plenary review of the question whether contractual language is clear or ambiguous, and we will affirm a summary judgment grant on an issue of contract interpretation only if the contractual language is "subject to only one reasonable interpretation." *Local Union No. 1992, Int'l Bhd. of Elec. Workers v. Okonite Co.*, 189 F.3d 339, 341 (3d Cir. 1999) (citations omitted). In determining whether contractual language is ambiguous, we will consider "the contract language, the proffer of the parties, and the extrinsic evidence offered in support of each interpretation." *Id.* at 343 (citation omitted). Beginning with the CBA's language, we can identify no ambiguity in Article

6

VII, Section 1's discussion of how ISP/EISP offers must be made to employees in a non-layoff situation.

The first sentence (which is also the first paragraph) of Article VII, Section 1 of the CBA contemplates the provision of ISP and/or EISP benefits in the event "the Company notifies the Union in writing that technological [or other] change . . . has or will create a surplus in any job title in a work location." The parties agree that there is no ambiguity in the meanings of "job title" or "work location." The "job title" of a Verizon employee describes her or his function within the company, such as a technician or an analyst. The "work location" describes the building where the employees work. Thus, Article VII, Section 1 begins by unambiguously describing the Company's power to identify a surplus in the context of (1) a job title and (2) a work location.

Once the company identifies a surplus in "any job title in a work location," Verizon may make ISP/EISP offers. However, the CBA states that these offers will be "subject to the following conditions." These conditions are given in subsections (a) – (c) of Section 1. Subsection (a) provides, *inter alia*, that Verizon "shall determine [1] the job titles and work locations in which a surplus exists," (2) "the number of employees in such titles and locations who are considered to be surplus," and (3) "the period during which the employee may, if he or she so elects, leave the service of the Company pursuant to this Section." With respect to the EISP offers, subsection (a) empowers Verizon to "limit acceptances to the number of surplus." Subsection (b) states that "[t]he number of

7

employees who may make such election shall not exceed the number of employees determined by the Company to be surplus." Subsection (c) recites the an employee must, within thirty days of Verizon's offer, transmit in writing his or her desire to leave Verizon and receive ISP or EISP benefits.

The above language makes clear that Verizon's discretionary power to make ISP/EISP offers is limited to "job title" and "work location." The opening sentence of Article VII, Section 1describes Verizon's discretionary powers in the context of job title and work location without making any mention of a "work group." This power is then conditioned in subsection (a)(1) on Verizon identifying surpluses in a "job title[]" and "work location[]," which reiterates that these are the parameters of Verizon's discretion. And, in subsection (a)(2), the parties state that Verizon shall have the power to determine the number of employees within "such titles and locations" who are considered surplus. Thus, again, Verizon's discretionary powers are discussed only in the context of being "condition[ed]" on identifying a job title and work location.

Verizon nonetheless argues that it has unhampered discretion to locate a surplus as it sees fit. In particular, Verizon claims that the contractual language does not inhibit the company from making non-layoff ISP/EISP offers by the "work group" that is housed within a work location. As described above, however, this position is not compatible with the text of Article VII, Section 1. First, Verizon does not argue that "job title" or "work location" actually means "work group." Therefore, if the CBA language

8

describing Verizon's discretionary powers was meant to extend to "work groups" within a job title and location, we would expect to find this language in Article VII, Section 1. Nor can Verizon argue that the drafters of the CBA were unfamiliar with discussing the distribution of employee benefits in the context of these sub-units because the very next section of the CBA – Article VII, Section 2(a) – contemplates locating a surplus within a "work group" when EISP offers are made in layoff situations.[4]

Also contradicting Verizon's reading of Article VII, Section 1 is the consistent use of the "job title" and "work location" terminology in the context of "conditions" placed on ISP/EISP offers, which indicate that they are indeed limiting factors on Verizon's power to make such offers. And the condition placed on Verizon's discretion – essentially making Verizon treat all similarly skilled employees at a location in the same way – is the type of condition one would expect a collective bargaining unit to demand of an employer so as to ensure that all of its equivalently skilled employees are treated equally.

In addition to arguing that there is no limiting language in the CBA, Verizon argues that certain words and phrases in Article VII, Section 1 could be read affirmatively to support the company's interpretation of that provision. Again, we cannot agree.

---

[4] Article VII, Section 2(a) of the CBA recites that "prior to proceeding to a layoff resulting from a surplus in any particular title, location, and *work group* the Companies will offer an Enhanced ISP Termination Allowance equal to two (2) times the normal ISP Termination Allowance (e.g., up to a maximum of $66,000) in surplus title and work location." (Emphasis added.)

Verizon focuses on the contractual language authorizing it to declare a surplus. The company calls attention to the phrases "the Company deems it appropriate" and "to the extent necessary to relieve the surplus."[5] These phrases, however, do not appear in the context of Verizon's power to locate the surplus, which is what the "job title" and "work location" language does. Rather, the phrases appear in the context of provisions relating to Verizon's power to dictate the size of any surplus. That is, if Verizon decides that there is a "force surplus" and "the Company deems it appropriate," then that surplus will be relieved through a seniority system, "to the extent necessary to relieve the surplus." The relevant question is not, however, Verizon's power to declare the existence of a surplus, which Local 827 does not dispute. Instead, the question before us is Verizon's asserted authority unilaterally to locate that declared surplus wherever the company pleases. And it is on this subject that the CBA places "conditions" on the reach of Verizon's power, namely confining to "job title" and "work location" the company's authority to locate a surplus.

Finally, Verizon contends that the meaning of "surplus" is ambiguous here because limiting Verizon's discretion to make ISP/EISP offers would mean that Verizon would

---

[5] At oral argument, Judge Stapleton reminded Verizon's counsel that "You have to be able to say that there is some wording in this contract that should be read differently because of this extrinsic context." Verizon's counsel responded by stating that the ambiguity lies in the words describing Verizon's discretionary powers and then specifically pointed to the "the Company deems it appropriate" and "to the extent necessary to relieve the surplus" language found in Article VII, Section 1.

have to make ISP/EISP offers to "non-surplus" employees. First, this argument only works if the contractual language could be read as localizing the "surplus" to a work group because – under that scenario – opening up the ISP/EISP benefits to employees outside the work group would necessarily mean that those outside employees are "non-surplus." But, as shown above, the relevant contractual language never describes "surplus" in the context of work groups; instead, "surplus" is only deployed in the context of "job titles" and "work locations." Second, sub-section (b) of Article VII, Section 1, authorizes Verizon to limit the number of employees who can accept the ISP/EISP offer to "the number of employees determined by the Company to be surplus." This language granting Verizon complete discretion to determine the size of a surplus would appear to address Verizon's concerns about over-eligibility among otherwise qualified candidates for the ISP/EISP benefits. Lastly, were "surplus" interpreted the way Verizon advances, the company would be empowered to make ISP/EISP offers narrowly so effectively as to obviate the Article VII, Section 1 requirement that the offers be made "in the order of seniority." Put another way, Verizon's reading of surplus would contravene the contractual language by permitting the company to make non-layoff ISP/EISP offers to individuals with less seniority than others of the same job title at the same work location.

For these reasons, we find no ambiguity in the language of Article VII, Section 1 requiring Verizon make non-layoff ISP/EISP offers to all individuals with the same job title and at the same work location.

11

### III. The Extrinsic Evidence

We next will consider Verizon's extrinsic evidence. In reviewing this evidence, however, we will not rely on it to "'add terms to a contract that is plausibly complete without them.'" *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of America, U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 146 (3d Cir. 1999) (quoting *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993) (en banc)). Instead, "'there must be either contractual language on which to hang the label of ambiguous or some yawning void that cries out for an implied term.'" *Skinner Engine Co.*, 188 F.3d at 146 (quoting *Bidlack*, 993 F.2d at 108) (ellipsis omitted); *see also American Cynamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177, 182 (3d Cir. 1995) (emphasizing that "the focus must remain on the language chosen by the parties," and that the "text unambiguous when accorded the commonly understood meaning of its words cannot be disregarded unless the extrinsic evidence is such as might cause a reasonable fact finder to understand the text differently"); *Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 134 (3d Cir. 1993) (holding that "overwhelming and uncontradicted" extrinsic evidence can be controlling as to a contract's interpretation).

Verizon points to the following extrinsic evidence: The company has provided testimony from Verizon managers that, from 1990 until 2001, it has operated its ISP/EISP program for non-layoff employees by declaring surpluses within work groups without complaint from Local 827. Verizon further asserts that Local 827 was aware of the way

the ISP/EISP program was being administered because the company sent a letter to the union each time a surplus was identified and an ISP/EISP offer made. Between 1990 and 2001, approximately thirty such notices were sent to Local 827. The specificity of these letters varied a great deal. Generally the ISP letters stated that the offer would go to job titles at work locations without specifying that the offers would be limited to individuals within identified work groups.[6] The EISP letters tended to be more specific and typically had either an attachment listing the employees within a work group who are to receive a benefits offer, or, alternatively, the letter would state the number of employees within a particular work group who are eligible to receive the offers.[7] Having reviewed this

---

[6] One illustrative example is an ISP letter sent to Local 827's president on March 28, 1995. In it the company writes:

> This is to inform you that force surplus exists in the Computerized Billing Operation Organization. It is intended to offer ISP to Associates in the following titles and locations: [Job Title – Service Analysts (29 Employees) and General Clerks (11 Employees); Location – 1100 Orange Ave., Cranford].

Excerpts of Record ("E.R.") at 671.

[7] The following is an example of a typical letter detailing an EISP offer:

> [June 19, 1995] This is to advise you that a force surplus exists in the Information Systems, Process Management district located in Madison, New Jersey. The Company will be offering [EISP] to one (1) Associate in the Service Analyst title. The name, social security number and NCS date of the effected [sic] employee are attached for your information.
> If surplus still exists at the conclusion of the offer, it is the Company's intention to proceed to layoff to alleviate the surplus. . . .

E.R. at 673.

13

evidence, we conclude Verizon's proffer does not create ambiguity in the plain meaning of Article VII, Section 1.

Because the extrinsic evidence is only useful insofar as it illuminates the parties' understanding of the contractual language, we focus on the letters that purport to show that for over a decade Local 827 was aware of and continually acquiesced in Verizon's directed benefit offers to individuals within a work group. These letters, while helpful to Verizon, do not indicate either "contractual language on which to hang the label of ambiguous or some yawning void that cries out for an implied term," *Skinner Engine Co.*, 188 F.3d at 146 (quoting *Bidlack*, 993 F.2d at 108) (ellipsis omitted).

It is clear from many of the letters that had the union leadership paid better attention to the letters, the leadership would have understood that the company was at least potentially interpreting the language of Article VII, Section 1 in a manner inconsistent with the union's own understanding of that language. To be sure, the ISP letters are not models in clarity. Though the letters identify that a surplus exists in a particular work group, they then go on to state that ISP offers would be made pursuant to "Job Title" and "Location." This latter description, of course, accords with the union's reading of Article VII, Section 1.[8] Nonetheless, given the many letters over the ten-year

---

[8]  It is also unclear from the record that a work group is necessarily a subset of a work location in all instances. If there are work locations that house a single work group, Local 827 would be unable to discern from the letters that benefit offers localized to a work group necessarily meant that other nonparticipating work groups were also housed at the same work location.

14

time span, a careful examination of these letters might have led the union leadership to question the company's implementation of Article VII, Section 1.[9]

Even as we recognize that the letters lend some support to Verizon's arguments, we do not find them so compelling as to require a radical reconstruction of the contract language negotiated by the union and the company. Prior to 2001, there were no employee-driven complaints about the way the company made benefit offers. Therefore, as the union correctly points out, even if the leadership was aware of the company's conflicting interpretation of Article VII, Section 1, it had no recourse through which to formally state its objections until the independent filing of a grievance by a union member. Since the union cannot compel a member to retire or otherwise leave his or her employment at the company solely for the purpose of challenging Verizon's understanding of the CBA, the union's failure to protest before 2001 cannot be taken as a particularly helpful signal of how Local 827 understood the contractual language during this period.[10] Thus, we conclude that Verizon's evidence in support of its interpretation

---

[9] Verizon argues that the deposition testimony of union steward, Fred Mazzaro, supports its argument that Local 827 was actively aware that benefit offers were being made by work group. However, Mr. Mazzaro's testimony is that a 1996 non-layoff ISP/EISP offer was "a special offer [made] just for his group," which indicates that he understood the offer was not made in accordance with the CBA. E.R. at 293. Further, he also testified that "if Verizon is going to come in and offer the Enhanced ISP or ISP to its employees, they should come in by title and location." E.R. at 295. Thus Mr. Mazzaro's testimony does not support Verizon's claim that the union read Article VII, Section 1 to empower Verizon to make non-layoff benefit offers by work group.

[10] Verizon also points the court to a 1992 letter sent to the president of Local 827 in which the company states that it will make a one-time offer to a service analyst who was

15

of Article VII, Section 1 is itself ambiguous and, therefore, does not operate to render ambiguous the plain language of the CBA. *Cf. Rolls-Royce Motor Cars, Inc.*, 989 F.2d at 134.

## IV. Conclusion

For the foregoing reasons, we will affirm the order of the District Court.

RENDELL, <u>Circuit Judge</u>, dissenting.

By giving laser-like scrutiny to the phrases "job title" and "location," and concluding that the absence of the term "group" or "department" is of critical significance, *see* Maj. Op. at 6-9, the majority casts aside a decade of practice that suggests, indeed, requires, that the concept of a "surplus" as used in Article VI, Section 1 of the CBA, when combined with the statement that Verizon "determines" the surplus, means or assumes application within a particular functional group or department. The mischief in which we engage undoes past practice entirely, declaring it verboten. Whereas Verizon could previously deal with a surplus of analysts in the bookkeeping

---

not part of the declared surplus. E.R. at 616. This letter does not, however, support Verizon's argument that Article VII, Section 1 is ambiguous because it clearly describes the party receiving the offer as non-surplus. Even if the employee was – as Verizon now claims – rightly a surplus employee under the plain meaning of Article VII, Section 1, it is not clear to us that the president of Local 827 would have possessed sufficient information to make that determination independently of Verizon's characterization. Consequently, Local 827's 1992 acceptance of Verizon's description of the employee as non-surplus is not compelling evidence in support of the company's interpretation of the CBA.

department to everyone's satisfaction by offering ISP benefits solely to analysts within that department, it now can only remedy the situation by offering ISP benefits to all analysts, and only if there is a surplus of analysts overall at a given location, which may house ten or fifteen groups.

The majority's opinion imposes a radically different business reality on Verizon and the workers; before we do so, we should make sure that the determination of surplus without the ability to consider the group or department was clearly contemplated and agreed upon. In *American Cyanamid Co. v. Fermenta Animal Health Co.*, 54 F.3d 177 (3d Cir. 1995), we noted the importance of language, but also of evidence that could inform meaning, and stated that "a text unambiguous when accorded the commonly understood meaning of its words cannot be disregarded *unless the extrinsic evidence is such as might cause a reasonable fact finder to understand the text differently*," *id.* at 182 (emphasis added). Here, we have such evidence. I, therefore, respectfully dissent, and would reverse and remand for a determination of the parties' intent in order to understand the meaning of the provision in question. I cannot imagine that the meaning ascribed by the majority would prevail.