ARTHUR J. OWENS, BERTRAM S. WILSON, IRMA LEWAL-
LEN, CHARLES S. SHAPIRO AND WILLIAM S. PEIFER,
PLAINTIFFS-RESPONDENTS AND CROSS-APPELLANTS,
v. PRESS PUBLISHING COMPANY, DEFENDANT-AP-
PELLANT AND CROSS-RESPONDENT.

Argued December 19, 1955—Decided January 30, 1956.

538

*Mr. John H. Yauch, Jr.,* argued the cause for the defendant-appellant and cross-respondent (*Mr. John O. Bigelow* and *Mr. James C. Fagan,* of counsel; *Messrs. Gilhooly, Yauch & Fagan,* attorneys).

*Mr. M. H. Goldstein,* of the Philadelphia Bar, argued the cause for the plaintiffs-respondents and cross-appellants, *pro hac vice* by leave of the court (*Mr. Bernard L. Barkan,* of the Philadelphia Bar, of counsel; *Mr. Albert B. Melnik,* attorney).

The opinion of the court was delivered by

HEHER, J. The essential question here concerns the meaning of a severance-pay provision of a collective bargaining agreement made by the defendant Press Publishing Company, the publisher of a newspaper in Atlantic City, New Jersey, and the Newspaper Guild of Philadelphia and Camden, a voluntary association affiliated with the American Newspaper Guild, C. I. O., as the exclusive collective bargaining representative of all editorial, news, photographic and art department employees of the Publishing Company. The first such agreement was made October 23, 1944, for a term of one year, following the certification of the Guild's local unit as the bargaining agent of defendant's employees pursuant to the National Labor Relations Act, 29 *U. S. C. A.*, *sec.* 159; and there were successive agreements thereafter until the last made November 30, 1950, for a term expiring August 22, 1952.

All the plaintiffs were employees of defendant in its editorial department; all but Lewallen entered defendant's employ during the subsistence of one of these collective bargaining agreements; Lewallen joined defendant's staff in 1935 and had been continuously in its employ when, in 1944, the Guild and defendant made the first such agreement.

The final agreement made in 1950, as just said, embodied this severance-pay clause, Article 20, of the same general purport as those that had gone before:

"When an employee is discharged for any reason other than gross misconduct, he shall be paid, in addition to any sum otherwise due him, one week's pay for each six (6) months of continuous service, or major fraction thereof, for a period of twelve (12) years, up to a maximum of twenty-four (24) weeks' pay."

And Article 19(a), entitled "Dismissals," provided:

"There shall be no dismissals except for good and substantial cause which shall include: dishonesty, willful neglect of duty and self-provoked discharges. Publisher agrees to give employees dismissed for causes other than those listed above, two weeks' advance notice of dismissal in addition to stated severance pay."

Pursuant to Article 27(d) of the collective bargaining contract made November 20, 1950, the Guild on June 19, 1952 notified the defendant employer of its desire to "negotiate" specified "changes in the provisions" of the agreement; and in accordance with section 8(d) of the Labor-Management Relations Act, 29 *U. S. C. A.* § 158(d), the Guild on the ensuing July 22 advised the employer of its "intention to terminate on August 23, 1952, the collective bargaining agreement between us," and proposed a conference "for the purpose of negotiating the contract modifications we have heretofore proposed." The negotiations failed; and their contractual collective bargaining relations ended when the then current contract expired by force of its own limitation.

Plaintiffs remained in defendant's employ until they were severally discharged in January, February and May 1953, for reasons other than gross misconduct, it is conceded; they were each paid the wages or salary due for the preceding week and, in addition, two weeks' wages or salary in lieu of notice of dismissal. Lewallen was also paid two weeks' wages as accrued vacation pay, and ten weeks' wages as severance pay. But the other plaintiffs were not given severance pay; and in this action they all seek recovery of such pay calculated at the rate of one week's wages or salary for each six months of the particular plaintiff's employment, allowing in Lewallen's case credit for the payment made.

The Law Division of the Superior Court, Judge Leonard sitting, 34 *N. J. Super.* 203 (*Law Div.* 1955), gave summary judgment in favor of each plaintiff for severance pay computed according to the periods of their respective employments terminating on the expiration of the last collective bargaining agreement, August 22, 1952, as "earned and accrued," "only the time of payment" being "postponed to the time when they were discharged, there being no claim that they were discharged for gross misconduct," the refusal of which would constitute a "forfeiture" of "earned and accrued rights."

There are cross-appeals to the Appellate Division, certified here for decision on our own motion. Defendant challenges

the allowance of severance pay; plaintiffs complain of the disallowance of such pay according to the particular plaintiff's period of service after August 22, 1952 until the employment was terminated by dismissal.

## I.

The employer's point is that the "rights created and arising under a collective bargaining agreement do not extend beyond the term of the contract"; and the right of the plaintiffs here to severance pay "in the event of discharge ended when the collective contract terminated, August 22, 1952," and was not a "vested right," and since the plaintiffs "were not discharged until several months later, they are not entitled to severance pay."

The ultimate purpose of a collective bargaining agreement is a common understanding on the terms and conditions of labor; and, in the quest for the common intention, as with other contracts, the relation of the parties, the attendant circumstances, and the objects they were striving to attain are necessarily to be regarded. *Cameron v. International Alliance of Theatrical Employees and Moving Picture Operators*, 118 *N. J. Eq.* 11 (*E. & A.* 1935); *Ibid.* 119 *N. J. Eq.* 577 (*E. & A.* 1936); *certiorari* denied 298 *U. S.* 659, 56 *S. Ct.* 681, 80 *L. Ed.* 1385 (1936); *Mantell v. International Plastic Harmonica Corporation*, 141 *N. J. Eq.* 379 (*E. & A.* 1947); *Harker v. McKissock*, 7 *N. J.* 323 (1951), rehearing denied 8 *N. J.* 230 (1951); *Atlantic Northern Airlines v. Schwimmer*, 12 *N. J.* 293 (1953); *Kennedy v. Westinghouse Electric Corporation*, 16 *N. J.* 280 (1954). In a word, the judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose. *Casriel v. King*, 2 *N. J.* 45 (1949). Where the "principal purpose" of the parties is found, "further interpretation of the words of contract should be such as to attain that purpose, if reasonably possible"; preliminary interpre-

tation may clearly show the parties' "primary purpose and end to be attained; and this at once reacts effectively in the detailed interpretation of subsidiary provisions and of particular words and specific acts"; when it becomes clear that the parties "intended to produce a certain factual result, interpretation should be affected by reasonable and necessary implications, so that the legal effect then given to the instrument will be such as to attain the intended factual result"; a court "may thus be able to realize the aims and purposes of the parties, even though their express words would otherwise be interpreted differently and would produce a different legal effect." *Corbin on Contracts, sec.* 545.

The employer invokes *System Federation No. 59, etc., v. Louisiana & A. R. Co.,* 119 *F. 2d* 509 (*5 Cir.* 1941), *certiorari* denied 314 *U. S.* 656, 62 *S. Ct.* 108, 86 *L. Ed.* 526 (1941), holding that collective bargaining agreements do not "extend rights created and arising under the contract, beyond its life, when it has been terminated in accordance with its provisions," and the "rights of the parties to work under the contract are fixed by the contract," and they "persist during, they end with, its term"; and *Paterson Parchment Paper Co. v. International Brotherhood of Paper Makers,* 191 *F. 2d* 252 (3 *Cir.* 1951), *certiorari* denied 342 *U. S.* 933, 72 *S. Ct.* 376, 96 *L. Ed.* 694 (1952), to the same effect. Neither of these cases is in point. The question posed in the first was whether seniority rights created by such a contract "persist during and only during its term, or whether they indefinitely continue to exist after it has been abrogated, and the relations of employer and employee are no longer fixed and being carried on, under that contract, but for many years under rules, promulgated by the company, and later under a contract between the company and the union which affirms it 'covers all understandings now in effect' "; the second was an action for damages brought by the employer against the union for an alleged breach of a collective bargaining agreement, by a strike that closed the plant, and it was found that appropriate notice of termination of the contract was given, and then suspended by negotiations toward a new contract, but when

the effort ended in failure, the obligation not to strike ceased to exist. These considerations, as we shall see, have no relation to the employee's right, upon dismissal from his employment, to severance pay which has accrued during the subsistence of a terminated collective bargaining agreement.

The doctrine of vested and contingent rights is invoked, citing *Carroll v. City of Newark*, 108 *N. J. L.* 323 (*E. & A.* 1932), and *Barrett v. Barrett*, 134 *N. J. Eq.* 138 (*Ch.* 1943). It is said in argument that the right to severance pay "was subject to the happening of an uncertain event, namely, their dismissal without sufficient cause," and "Clearly their right had not vested when the collective contract had expired, for they might die while still in defendant's employ, they might resign, they might be discharged for gross misconduct."

But severance pay has an attribute and purpose that render these considerations inapposite. Considered in the context of the contractual scheme, the relation of the parties, and the object in view, the severance pay here provided for was in essence a form of compensation for the termination of the employment relation for reasons other than the displaced employee's gross misconduct, primarily to alleviate the consequent need for economic readjustment, but also to recompense him for certain losses attributable to the dismissal. It has been said that while one of the objectives of dismissal or severance pay "is to ease the employee's financial burden while looking for a new job," such pay is also "partial compensation for loss of seniority rights; loss of possible pension rights; compensation for retraining or acquiring new skills; and many others * * *." *Ackerson v. Western Union Telegraph Co.*, 234 *Minn.* 271, 48 *N. W.* 2d 338, 25 *A. L. R.* 2d 1063 (*Sup. Ct.* 1951). The reasons may vary in particular cases, but the principle is the same. Severance pay is terminal compensation measured by the service given during the subsistence of the contract, in this case the collective bargaining agreement, payable on discharge from the employment not induced by misconduct, according to the prescribed formula, a means of recompense for the economic exigencies

and privations and detriments resulting from the permanent separation of the employee from service for no fault of his own. In a real sense it is remuneration for the service rendered during the period covered by the agreement. Compare *United States v. Lowden,* 308 *U. S.* 225, 60 *S. Ct.* 248, 84 *L. Ed.* 208 (1939) ; see *Collective Bargaining Contracts* (1941), published by the Bureau of National Affairs, Inc., Washington, D. C. It is not unemployment compensation, which has reference merely to the period of unemployment and the actual wage loss. *Ackerson v. Western Union Telegraph Co., supra; In re Public Ledger,* 161 *F.* 2d 762 (3 *Cir.* 1947). See also *Hawkins, Dismissal Compensation* (Princeton University Press, 1940), *pp.* 10–13.

And this displacement allowance was not a gratuity dependent upon the arbitrary will or caprice of the employer, such as would be the case were the employer free to await the termination of the collective bargaining agreement, whence came the stipulated right, and then, forthwith, on the very next day, discharge the employee without the displacement allowance. This would be an utterly unreasonable concept of the symbols used to express the common intent and understanding, fairly presumed to have been a measure deemed serviceable to the mutual interests of the employer and the employee, *i. e.,* service continuity and efficiency. In this regard the employer here concedes only that "if employees are usually paid on a Thursday for the work of the week which ended the preceding Saturday, and if in the interval the contract expires which fixed their wage scale, still the termination of the contract does not affect their right to be paid for the work they performed, for their right to the pay vested before the contract expired," an arbitrary and unduly restrictive view of the contractual terms.

Separation pay is not based upon a breach of contract, but is a "claim within the terms of the hiring"; the discharge provision of the Guild contract "relates to wages and any sum received by the employee under it is a part of his wage"; "under the Guild contract the money to be paid under the provision for discharge pay * * * is wages and entitled

to payment out of the estate," the part earned under the administration of the trustees in bankruptcy to have priority as administration expenses, and the part earned within the provisions of *section* 64, *sub. a*(2) of the Bankruptcy Act, 11 *U. S. C. A.* § 104, *sub. a*(2), to be given the priority provided for by that section. *In re Public Ledger, supra.* See footnote 9 to this opinion, so reading the contract that the "severance pay was a debt which was allocable against the period in which it was earned."

█ And a "vacation with pay is in effect additional wages"; such is "a reasonable arrangement to secure the well being of employees and the continuance of harmonious relations between employer and employees"; the "consideration for the contract to pay for a week's vacation had been furnished, that is to say, one year's service had been rendered * * *, so that the week's vacation with pay was completely earned and only the time of receiving it was postponed"; "If the employer had discharged the employee wrongfully after the latter had done the work necessary to earn a vacation he could not be deprived of the benefits due him." *Re Wil-Low Cafeterias, Inc.,* 111 *F. 2d* 429 (2 *Cir.* 1940). There, Judge Augustus N. Hand disapproved the case of *Donlan v. City of Boston,* 223 *Mass.* 285, 111 *N. E.* 718 (*Sup. Jud. Ct.* 1916), treating the contract of a teacher who died during the summer vacation as subject to "an implied condition * * * that she should be living and physically able to do the work," and disallowing her salary for the final month. He referred to Professor Williston's criticism, in a footnote to *section* 838 of the revised edition of his work on *Contracts* published in 1936, that there was "no express condition, qualifying the city's promise, and as the teacher had substantially fulfilled her contract, there was no failure of consideration." See *Textile Workers Union of America v. Paris Fabric Mills, Inc.,* 22 *N. J. Super.* 381 (*App. Div.* 1952); *Kidde Manufacturing Co., Inc., v. United Electrical Radio & Machine Workers of America, Local* 437, 27 *N. J. Super.* 183 (*Ch. Div.* 1953); also *Hercules Powder Co. v. Brookfield,* 189 *Va.* 531, 53 *S. E. 2d* 804 (*Sup. Ct. App.* 1949), holding

that dismissal pay there provided for constituted "earned benefits" that survived the termination of the contract; also *Elgin, Joliet & Eastern Ry. Co. v. Burley*, 325 *U. S.* 711, 65 *S. Ct.* 1282, 89 *L. Ed.* 1886 (1945); *Kordewick v. Brotherhood of Railroad Trainmen*, 181 *F.* 2d 963 (7 *Cir.* 1950); *Lewellyn v. Fleming*, 154 *F.* 2d 211 (10 *Cir.* 1946).

In a study of *"Severance Pay Provisions in Collective Bargaining Agreements,"* April 1950 issue (*Vol.* 70, *No.* 4, *p.* 384) of the *Monthly Labor Review*, the purpose is stated thus:

"Dismissal or severance pay is a sum of money in addition to any accrued wages or salaries for past work, paid to an individual whose employment is terminated through no fault of his own. The most common objective of dismissal pay plans has been, of course, to ease. the employee's financial burden, while he is looking for a new job. Other objectives include the provision of partial compensation to the separated worker for retraining or acquiring new skills, and the maintenance of good will of employees and the community generally."

In short, the separation pay here stipulated was not conditioned upon the employee's discharge from service within the term of the collective agreement. Such qualification of the allowance would run counter to the letter and the manifest reason and spirit of the contract; it would plainly disserve the mutual interests the parties had in view, reasonably deducible from the contract taken as a whole.

Of course, the right to such pay can "arise" only during the subsistence of the contract so providing, and not after its termination; but once the right thus comes into being it will survive the termination of the agreement. Discharge from service during the term of the contract is not a condition *sine qua non* to the enforcement of the accrued right.

## II.

And so the plaintiffs' several claims for severance pay for the period intervening the termination of the collective bar-

gaining agreement and their discharge from service are ill-founded.

The argument is that when a collective agreement "is in existence, all of its provisions respecting conditions of employment must also be incorporated in the individual contract of employment," and where the "collective bargaining contract expires, but the master and servant relationship continues, the terms of employment spelled out in the collective bargaining agreement and incorporated in the individual contract of employment can be altered only by a new collective contract agreed upon with the bargaining agent or by virtue of lawful negotiations with the individual employee resulting in an individual agreement for changes in the terms of employment"; and here "no new collective bargaining agreement was entered into with the bargaining agent nor was it lawfully possible for the employer to engage in individual bargaining with the employees, and no lawful agreements were entered into with the individual employees to change the previously existing terms of employment."

In sum, it is said that the common law "imports an individual contract of employment wherever there is an employer-employee relationship," and each plaintiff "had an individual contract of employment which embodied as conditions of employment the provisions of the collective bargaining contract," citing *Christiansen v. Local* 680 *of Milk Drivers & Dairy Employees of New Jersey,* 126 *N. J. Eq.* 508 *(Ch.* 1940); *Dooley v. Lehigh Valley Railroad Co.,* 130 *N. J. Eq.* 75 *(Ch.* 1941), affirmed 131 *N. J. Eq.* 468 *(E. & A.* 1942), *certiorari* denied 317 *U. S.* 649, 63 *S. Ct.* 45, 87 *L. Ed.* 523 (1942); *Fagliarone v. Consolidated Film Industries, Inc.,* 20 *N. J. Misc.* 193 *(Cir. Ct.* 1942), affirmed 131 *N. J. L.* 315 *(E. & A.* 1944); *J. I. Case Co. v. National Labor Relations Board,* 321 *U. S.* 332, 64 *S. Ct.* 576, 88 *L. Ed.* 762 (1944); *Association of Westinghouse Salaried Employees v. Westinghouse Electric Corporation,* 348 *U. S.* 437, 75 *S. Ct.* 488, 99 *L. Ed.* 510 (1955).

But the right to separation pay was a creature of the collective agreement alone, a consensual undertaking

limited to a fixed term; and it is fundamental in the law of contracts that upon the expiration of the period thus prescribed the agreement ceased to exist and its provisions had no *in futuro* force and effect. When the contract under which the right to severance pay arose expired of its own limitation, the right itself came to an end save as to the pay that had accrued during the contract term. This, in accordance with the expressed will of the parties. Indeed, the Guild itself gave prior notice of its "intention" to "terminate" the collective agreement at the expiration of the prescribed term, although this is not in itself of determining significance. It is of the very nature of the collective agreement that once it expires of its own limitation it is no longer an integral part of the direct contract of hire between the employer and the employee, unless there be explicit provision otherwise. A contract arises and subsists by the consent of the parties. Severance pay was a term of the particular employment contract only so long as the collective agreement so provided. This is the natural and reasonable view of the contractual relation. Certainly, each successive collective agreement supplanted the preceding agreement in relation to the provision for displacement pay and governed the contract of hire accordingly.

And these considerations are dispositive of the point that the Guild's notice terminating the collective bargaining agreement was given "under the compulsive requirements of *Section* 8(*d*) of the Taft-Hartley Act," and "Accordingly it cannot be assumed that the intent or effect of the Guild notice was to terminate or extinguish any of the rights or working conditions of the individual employees." The principle invoked here is that the collective bargaining agent has power to alter the rights of the employees under the "collective bargaining agreement prospectively only," citing *Elgin, Joliet & Eastern Ry. Co. v. Burley, supra.* But there was no attempt to modify plaintiffs' rights under the contract. We are concerned here with their right to severance pay during the employment subsequent to the expiration of the collective contract. The argument seems to proceed on

the mistaken hypothesis of a continuance of the separation-pay provision in the direct contract of hire, after the termination of the collective agreement.

There was no agreement for severance pay for the service rendered after the collective agreement came to an end. On September 1, 1952 the employer posted on its bulletin board, placed where the employees assembled for work, a notice of the "conditions of employment" which made no provision for severance pay; and later on, September 15 ensuing, the employer posted a proposed agreement expressly conditioned on formal execution by the parties. It is conceded that the Guild did not sign the draft thus submitted, nor accept its terms, informally or otherwise.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.