**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3566-21

WAWA, INC.,

    Plaintiff-Appellant,

v.

BARRINGTON
REDEVELOPMENT, LLC,
BARRINGTON URBAN
RENEWAL REDEVELOPMENT,
LLC, and BOROUGH OF
BARRINGTON,

    Defendants-Respondents.

_____

        Argued October 5, 2023 – Decided March 11, 2024

        Before Judges Vernoia, Gummer, and Walcott-Henderson.

        On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-4108-18.

        Philip S. Goldberg argued the cause for appellant (Shook, Hardy & Bacon, LLP, attorneys; Philip S. Goldberg, Joseph Henry Blum and Erin Loucks Leffler, on the briefs).

Amy L. SantaMaria argued the cause for respondents Barrington Redevelopment, LLC, and Barrington Urban Renewal Redevelopment, LLC (Kaplin Stewart Meloff Reiter & Stein, PC, attorneys; Amy L. SantaMaria, on the brief).

Timothy J. Higgins argued the cause for respondent Borough of Barrington.

PER CURIAM

Plaintiff Wawa, Inc., appeals from a series of orders denying its summary-judgment motions and granting in whole or in part the summary-judgment motions and cross-motion of defendants Barrington Redevelopment, LLC (Barrington Redevelopment), and Barrington Urban Renewal Redevelopment, LLC (BURR) (collectively the Landlord defendants) and defendant Borough of Barrington (the Borough), ultimately requiring plaintiff to pay a "special assessment" related to financial assistance the Borough had provided to BURR. Because the motion judge erred in finding plaintiff contractually responsible for that "special assessment," we reverse and remand for proceedings consistent with this opinion.

I.

We discern the material facts from the summary-judgment record, viewing them in a light most favorable to the non-moving party. See Memudu v. Gonzalez, 475 N.J. Super. 15, 18-19 (App. Div. 2023).

2

In 2001, the Borough Council adopted an ordinance approving a redevelopment plan for certain blocks of property it previously had designated as an area in need of redevelopment pursuant to N.J.S.A. 40A:12A-6. Barrington, N.J., Ordinance No. 753 (Aug. 14, 2001). The Borough Council approved Resolution 9-2011-99 on September 13, 2011, naming Delco Development, LLC (Delco), or its assigns, as the redeveloper of at least two blocks. Barrington Borough Council Resolution 9-2011-99 (Sept. 13, 2011). Barrington Redevelopment was Delco's assignee for purposes of Resolution 9-2011-99.

On July 25, 2012, plaintiff, as the tenant, and Barrington Redevelopment, as the landlord, entered into a "land lease agreement" (the Lease) in which plaintiff agreed to lease from Barrington Redevelopment, approximately two acres of land located at Route 30 and Bell Avenue in Barrington, "proposed as Block 57.01, Lot 1" (the Leased Premises), for twenty years with the option to extend the term of the Lease. The "Leased Premises" section of the Lease referenced "a separate parcel" located "[i]mmediately adjacent to the Leased Premises" and "identified as Phase I on the Concept Plan (the 'Adjacent Parcel')." The Concept Plan was attached as an exhibit to the Lease. According

to the Lease, both plaintiff and Barrington Redevelopment, had approved the Concept Plan.

In the Lease, plaintiff recognized that Barrington Redevelopment or its affiliate was or would be the redeveloper for the Leased Premises pursuant to a redevelopment agreement with the Borough, which was described as "the current owner of a portion of the Leased Premises." Plaintiff also acknowledged Barrington Redevelopment could assign the Lease to "an 'urban renewal' entity that would acquire fee title to the Leased Premises for the purpose of effectuating a financial agreement under New Jersey's Long Term Tax Exemption Law [(Tax Exemption Law)], N.J.S.A. 40A:20-1 [to -22] . . . which entity shall assume all of [Barrington Redevelopment's] obligations under this Lease." The Lease referred to the financial agreement under the Tax Exemption Law as a "PILOT" agreement. We understand "PILOT" to stand for "payment in lieu of taxes."

Section 7A of the Lease is entitled "Landlord's Work . . ." and provides that the Landlord at its "expense shall obtain Landlord's Approvals and complete all of the site work described in the final Land Development Plans, and all other Landlord's Approvals (collectively, 'Landlord's Work') . . . ."

4

Paragraph (a)(iv) of Section 7 of the Lease defines "Land Development Plans" as:

> the final and preliminary plans prepared by the Deciding Engineer for the development of the Leased Premises based upon the Concept Plan, and showing, among other things, building footprints, the fuel dispensing facility and canopies, signs, . . . sidewalks, parking areas, access drives and driving lanes, curb cuts for ingress and egress permitting all turning movements to and from each road abutting the Leased Premises (subject to approval by the New Jersey Department of Transportation) as shown on the Concept Plan as well as the other potential users for the proposed development, curbing, grading, retaining walls, installation of water, sewer and storm water drainage lines, but excludes Tenant's Construction Plans . . . as signed off on by all Applicable Authorities without any conditions or qualifications unacceptable to Tenant in its reasonable discretion.

Paragraph (a)(v) of Section 7 of the Lease defines "Landlord Approvals" as "all approvals necessary to perform Landlord's Work and to allow Tenant to submit architectural plans for building permits for Tenant's Use . . . ." and includes "all New Jersey Department of Transportation ('DOT') and local highway occupancy permits for the construction of . . . all work within the public rights of way of the adjacent public streets."

The list of activities enumerated in the Landlord's Work section of the Lease includes:  "[c]learing and rough grading the leased premises";

5

"[i]nstallation of all utility lines, wiring, and facilities"; design and construction of "all of the storm water management"; "[r]elocation or removal of public and private utility lines, poles or facilities within or outside of the Leased Premises, including without limitation, PSE&G, Verizon, and fiber optic cable, as necessary to complete construction in accordance with the final Land Development Plans"; and "[e]ntering into any public works agreements for roadways and access to the Leased Premises, if applicable, and installation of all on and offsite improvements required by Landlord's Approvals, including but not limited to (if applicable), all paving, curbing, and utility pole relocation required within DOT rights of way."

Section 11 of the Lease, entitled "Liens and Taxes," provides:

(a) Beginning on the Rent Commencement Date, Tenant shall pay to the applicable taxing authority all real estate taxes and assessments that may be levied, assessed or charged against the Leased Premises by any governmental authority. . . . "Taxes" shall include gross receipts taxes, taxes on rents and other similar taxes imposed on Landlord or Tenant. Tenant understands and agrees that all or a portion of the Taxes may be payable pursuant to a financial agreement under New Jersey's Long Term Tax Exemption Law, N.J.S.A. 40A:20-1 [to -22], in which case all payments due under the financial agreement shall be considered Taxes and payable by Tenant as otherwise applicable to Taxes in this Lease.

6

(b) If the Leased Premises is separately assessed, Landlord shall endeavor to arrange to have all notices concerning tax assessments, changes in assessments, tax rates and changes, and tax bills (collectively, "Tax Bills") sent directly from the applicable governmental authorities to Tenant . . . . If the Leased Premises is separately assessed, Tenant shall have the right, at its sole cost and expense, to contest the amount or validity of the taxes applicable to the Leased Premises by appropriate administrative and legal proceedings either in its own name, Landlord's name, or jointly with Landlord, by counsel selected and engaged by Tenant. Landlord shall execute and deliver to Tenant whatever documents may be reasonably necessary or proper for Tenant to contest the taxes, or which may be necessary to secure payment of any refund which may result from such proceedings.

Thus, in the Lease, plaintiff and the Landlord expressly acknowledged the Landlord could assign the Lease to an urban renewal entity that could effectuate a PILOT agreement under the Tax Exemption Law, and they agreed payments under that agreement would be considered "taxes" for purposes of the Lease and plaintiff would pay those "taxes."

Two days after it executed the Lease, Barrington Redevelopment identified as the "Redeveloper" and as Delco's assignee, entered an agreement with the Borough regarding the redevelopment of some of the lots included in the redevelopment plan approved in Ordinance No. 753 (the Redevelopment Agreement). The parties to that agreement anticipated the redevelopment would

be performed in two phases, with Phase I being "the construction of a gasoline filling station and convenience store on a portion" of the property and Phase II being "the construction of a retail restaurant on the remaining portion" of the property.

The Borough and the Redeveloper acknowledged the Redeveloper intended "to qualify . . . as an 'urban renewal entity' pursuant to [the Tax Exemption Law] and enter into a [PILOT] Agreement for all improvements to the redeveloped property."

The Redevelopment Agreement required the Redeveloper to purchase from the Borough the property to be redeveloped for $3,750,000 and to "complete certain public improvements which will be made for the Redevelopment Project and benefit the general public as a whole." The public improvements were described in an exhibit attached to the Redevelopment Agreement:

> As a result of the Redevelopment Project – Phases 1 and 2, the following "Public Improvements" are proposed:
>
> - Creation of Bell Avenue Extension (to serve as site access and a jug-handle).
>
> - Widening of the White Horse Pike (N.J.S.H. Route 30) to accommodate an exclusive westbound left-hand turn lane to Bell Avenue extensions.

- Installation of a traffic signal at the intersection of the White Horse Pike (N.J.S.H. Route 30) and Copley Road (County Route 666).

- Widening of the White Horse Pike (N.J.S.H. Route 30) to accommodate an exclusive westbound right-had turn lane to Copley Road (County Route 666).

- Installation of Street Lighting.

- Installation of stormwater management facilities (i.e. inlets, piping and detention basin) to accommodate the runoff generated by Bell Avenue Extension.

The Redeveloper agreed to complete the public improvements "at its own cost and expense but subject to a [$1,900,000] credit against the Purchase Price."

In a September 15, 2014 memorandum to Tom Juliano, who was the managing member of Delco and had executed the Lease and the Redevelopment Agreement on behalf of Barrington Redevelopment, counsel[1] summarized his "understanding of our proposal for the terms of the financing we are discussing with the Borough . . . for the redevelopment project." He described the "[t]ype of financing" as a "[s]pecial assessment against the two redevelopment parcels (percentages to be worked out). We need to work out how the funds will get to

---

[1] It is not clear whether counsel represented Juliano, Delco, or Barrington Redevelopment or some combination of them.

Delco for the redevelopment project." He identified "[q]ualified redevelopment bonds" as the "[s]ource of funds" and indicated "[t]he two property owners will pay to the Borough the debt service on the Bonds as and when due."

In March 2015, BURR, identified as the "Redeveloper," and the Borough entered an "Agreement to Provide Financial Assistance for Redevelopment" (Financial Assistance Agreement). In that agreement, the Borough and the Redeveloper referenced the property previously determined by the Borough to be an area in need of redevelopment and the Redeveloper's intention to construct on one lot of that property "a gasoline filling station and convenience store" and "a retail restaurant" on another lot. Those two lots were collectively defined as the "Property" and the construction on those two lots of the Property was defined as the "Project."

To "facilitate the Project," the Borough agreed to provide the Redeveloper with $2,740,000[2] in "financial assistance," which was defined as "Borough Financing" the Borough would fund by "issuing a series of short-term bond anticipation notes." Attached to the Financial Assistance Agreement was a "Project budget," which "reasonably represent[ed] the Redeveloper's estimate

---

[2] According to the Borough's Chief Financial Officer Denise Moules, the principal amount ultimately was $2,788,000.

. . . of the costs and expenses for the portion of the Project to be funded from the Borough Financing."  With a total cost of $2,740,000, the budget included the following items:

| | |
|---|---|
| MOBILIZATION & LAYOUT | 35,000.00 |
| SITE CLEARING & DEMO | 44,000.00 |
| SOIL EROSION CONTROL | 17,870.00 |
| EARTHWORK | 282,858.29 |
| STORM | 150,000.00 |
| CONCRETE | 90,154.00 |
| PAVING | 515,000.00 |
| STRIPING & SIGNAGE | 19,844.00 |
| FENCE & GUIDE RAILS | 11,209.00 |
| LANDSCAPING | 8,950.00 |
| RETAINING WALLS | 35,000.00 |
| SITE LIGHTING / ELECTRICAL | 50,000.00 |
| SIGNALIZATION | 317,096.00 |
| TRAFFIC SAFETY & CONTROL | 75,000.00 |
| NJDOT PERMIT/INSPECTION FEES | 187,250.00 |
| NJDOT ESCROW FEES | 40,000.00 |
| POLICE TRAFFIC SAFETY | 60,000.00 |
| ROADWAY LIGHTING | 18,800.00 |
| GEOTECHNICAL TESTING | 3,879.83 |

. . . .

| | |
|---|---|
| SITE SUPERVISION | 172,868.00 |
| CONSTRUCTION CONTINGENCY/ WINTER CONDITIONS/INSURANCE | 171,024.88 |
| NJDOT BOND | 18,196.00 |
| PSE&G POLE RELOCATION | 356,000.00 |
| TOWNSHIP INSPECTION ESCROWS ESTIMATE | 60,000.00 |

11

The Redeveloper agreed to "repay the Borough Financing" in installments payable on October 1 of 2015 through 2024. Payments in 2015 and 2016 were for "the cost to issue the then outstanding Bond and all interest due and owing on the outstanding Principal." Installment payments on the principal began in 2017.

The Redeveloper and the Borough agreed "[t]he obligation to repay the Borough refinancing will be a special assessment and lien against the Property." In paragraph twelve of the Financial Assistance Agreement, entitled "Special Assessment":

> The Redeveloper and the Borough acknowledge and agree that the Redeveloper's acceptance of the Borough Financing from the Borough is a benefit for municipal improvements pursuant to N.J.S.A. 54:5-7 and N.J.S.A. 40:56-21. The Redeveloper's obligation to repay the Borough Financing pursuant to that Agreement is a special assessment and a lien on the Property.

In the next paragraph, the Redeveloper and the Borough agreed "the Borough Financing shall not be consider[ed] a construction loan."

Juliano executed the Financial Assistance Agreement on behalf of the Redeveloper. He never had any discussions about the agreement with anyone at Wawa. Defendants never advised plaintiff about the agreement. Plaintiff had no role in the negotiations of the agreement, did not sign it, and was not a party

12

to it. The Lease contained express language regarding a PILOT agreement, the Tenant's and Landlord's agreement to treat payments under the PILOT agreement as "taxes," and the Tenant's agreement to pay those "taxes." It was silent as to any Financial Assistance Agreement and did not include any agreement between the Tenant and Landlord to have the Tenant make the repayments due under a Financial Assistance Agreement or to treat the payments due under any Financial Assistance Agreement as a "special assessment."

The Borough Council passed Resolution 3-2015-39 on March 10, 2015, approving the Financial Assistance Agreement and authorizing the Borough's mayor to execute it. Mirroring the language in the Financial Assistance Agreement, the Resolution contained the same descriptions of "Property" and "Project" and stated, "the obligation to repay the Borough refinancing will be a special assessment and lien against the Property." The agenda for the March 10, 2015 Borough Council meeting said nothing about the adoption, imposition, or consideration of any "special assessment." It simply set forth a list of resolutions to be "read and approved" during that meeting. Resolution 3-2015-39 was identified in that list as a resolution "Authorizing Execution of a Financing Agreement Between the Borough of Barrington and [BURR] for the White

13

Horse Pike Redevelopment Project," a description devoid of any reference to "special assessment."

Former Borough Council member Kirk Popiolek[3] testified that the Borough's adoption of the Financial Assistance Agreement by resolution was the extent of the process the Borough took to approve the "special assessment." He was not aware of any reports or other documentation showing any type of Borough evaluation in levying the "special assessment" other than the Financial Assistance Agreement. He was not aware of any evaluation or analysis regarding apportioning the "special assessment" between the two lots within the Property or other adjacent properties.

On January 4, 2016, BURR, described as "an urban renewal entity formed and qualified under the Tax Exemption Law," and the Borough entered into a "Financial Agreement for Long Term Tax Exemption" (the PILOT Agreement). Under the terms of the PILOT Agreement, improvements to the property, which was described as being one lot, were held to be tax exempt under the Tax Exemption Law for a period of twenty years. In consideration for that tax exemption, BURR agreed to pay the Borough "an annual service charge for

---

[3] Popiolek was an elected member of the Borough counsel from 2004 to 2019 and for some of those years served as the Borough's Director of Economic Development and Director of Administration and Finance.

A-3566-21

municipal services" in quarterly installments on the dates when "real estate tax payments are due." The Borough's Tax Collector's Office subsequently sent to BURR notices entitled "Payment in Lieu of Taxes" that included information regarding the quarterly installment payments that were due. Plaintiff has made those payments in accordance with the express understanding and agreement concerning payments due under the PILOT Agreement as set forth in Section 11 of the Lease.

The Borough, not the Borough's Tax Collector's Office, addressed to Juliano an invoice dated August 16, 2017, stating that on October 1, 2018, a total payment of $391,145.72 was due, which was comprised of $348,500 for "2017 Special Assessment for WAWA Redevelopment – Principal,"[4] $41,147.78 for "2017 Special Assessment for WAWA Redevelopment – Interest," and $1,497.94 for "Professiona[l] Services – Processing BAN (Parker McCay)."[5] The Landlord defendants requested the invoice be revised to eliminate the itemized charges. On August 17, 2017, at 2:24 p.m., the Borough's

---

[4] $348,500 equals one eighth of the principal amount of $2,788,000 in financial assistance provided by the Borough to BURR.

[5] Given the definition of "Borough Financing" in the Financial Assistance Agreement, "BAN" appears to be an abbreviation for "bond anticipation notes." See also Nuveen Mun. Tr. v. Withumsmith Brown P.C., 752 F.3d 600, 601 (3d Cir. 2014) (defining "BAN" as a bond anticipation note).

A-3566-21

Chief Financial Officer Denise Moules sent Juliano an e-mail attaching "the revised invoice." At 2:41 p.m., Juliano sent Moules an e-mail, asking her if she could "revise [the invoice] to say Special Assessment Tax." That evening, she responded in an e-mail stating, with a happy face emoticon, "Third time is the charm."

In a September 6, 2017 letter to plaintiff, Barrington Redevelopment's Senior Property Manager Jay Rizzo enclosed "the 2017 Special Assessment tax bill for your store located at 280 White Horse Pike in Barrington, NJ." He instructed plaintiff to "[p]lease make payment direct to the Borough of Barrington." Like the initial invoice sent to Juliano, the enclosed invoice was dated August 16, 2017, and was from the Borough to Juliano. Unlike the initial invoice, the enclosed invoice did not include a breakdown of charges. Instead, it sought the total amount, $391,145.72, which was described as "2017 Special Assessment Tax for WAWA Redevelopment," using Juliano's requested language. Plaintiff's third-party provider responsible for plaintiff's tax payments paid the invoice on behalf of plaintiff.

In early November of 2017, Megan Dugan, who was plaintiff's Supervisor of Real Estate Services and Property Management, sent e-mails to Moules asking for information regarding the invoice, including "what this charge is for

16

and if there are any documents or written agreements that [she could] have access to . . . ." In a subsequent e-mail, Moules apparently told Dugan the "property owner" had told her "this tax bill is Wawa's responsibility." In a December 3, 2017 e-mail, Moules told Juliano, "the responsibility for payment is still with your company."

In a February 20, 2018 letter to Barrington Redevelopment, plaintiff's deputy general counsel stated plaintiff had paid the Borough $391,145.72, which she described as a "portion of the financing that Landlord and/or its affiliate received from the Borough to develop the Leased Premises and surrounding property." Because those funds were "used to perform Landlord's Work" and because Section 7A of the Lease required the Landlord to "complete all of Landlord's Work at Landlord's sole cost and expense," plaintiff demanded the Landlord reimburse plaintiff's payment to the Borough. Barrington Redevelopment refused to reimburse plaintiff, contending plaintiff was responsible for the payment under Section 11(a) of the Lease.

On October 31, 2018, plaintiff filed a complaint against the Landlord defendants, seeking reimbursement of the $391,145.72 it had paid to the Borough and a judgment declaring it was not in default of any of its Lease obligations, the payments due under the Financial Assistance Agreement were

the Landlord defendants' obligation, and the Landlord defendants were solely responsible for paying all costs associated with "Landlord's Work," including any assessment levied on the property pursuant to the Financial Assistance Agreement. Plaintiff also pleaded causes of actions based on breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and common-law fraud. The Landlord defendants filed an answer and counterclaims in which they sought a judgment declaring plaintiff was not entitled to a reimbursement and was responsible for the "2018 assessment . . . and any and all future assessments and real estate taxes that may be levied, assessed or charged against the Lease Premises . . . ." The Landlord defendants also pleaded causes of action based on breach of contract and unjust enrichment.

Plaintiff moved for summary judgment on October 2, 2020, and the Landlord defendants cross-moved for summary judgment. After hearing argument, the motion judge in October 30, 2020 orders denied plaintiff's motion and granted in part the Landlord defendants' motion, declaring plaintiff was obligated to pay:

> all assessments levied against the Leased Premises by any governmental authority pursuant to Section 11(a) of the Lease; subject to [its] right to dispute the amount of the assessment charged as a result of the [Financial Assistance] Agreement as material facts may exist as to

18

whether [it] owes the entire amount or a proportional amount.

In a decision placed on the record, the judge rejected plaintiff's interpretation of the Landlord's Work provision of the Lease but indicated he perceived then "no basis whatsoever for this assessment . . . to lay entirely on lot number one" and concluded he did "not have enough information on [which] to make a determination" on that issue and did not want to "take th[e] right away from Wawa to attempt . . . to challenge the fact that the assessment wasn't apportioned."

Plaintiff served on the Borough a request pursuant to the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13, for "[a]ll documents related to taxes, assessments, or liens levied [or] assessed against or related to the property designated as Block 57, Lots 1 and 2" or BURR from 2012 through the present. The Borough produced approximately twenty pages in response to the request. During his deposition, Popiolek reviewed the records produced by the Borough in response to plaintiff's OPRA request. He was not able to identify any documents relating to the purported "special assessment."

Plaintiff moved again for summary judgment on May 14, 2021. Plaintiff argued, among other things, that "[b]ecause the process in levying a special assessment under New Jersey law was not followed, the special assessment

19

[wa]s invalid and [the Landlord defendants had] improperly passed" along the obligation to pay for it. On June 29, 2021, the Landlord defendants opposed the motion and cross-moved for summary judgment. In a July 9, 2021 order and a decision he placed on the record that day, the judge denied plaintiff's motion but allowed plaintiff to amend its pleadings to name the Borough as an additional party. Plaintiff had not moved for leave to amend. The judge told counsel the Borough "ha[d] to be in the case." The judge declined to decide the cross-motion at that time.

Consistent with the judge's directive, on August 18, 2021, plaintiff filed an "amended complaint including action in lieu of prerogative writs" in which it named the Borough as an additional defendant "to confirm that the [Financial Assistance Agreement] repayment obligation is not a real estate assessment, special assessment, or other assessment under New Jersey law." Plaintiff requested "review, hearing and relief from the Borough's decision to characterize the Redevelopment Defendants' repayment obligation under the Assistance Agreement as a 'special assessment and lien' because they were made informally and decided on an ex parte basis."

The Borough answered the amended complaint and subsequently moved for summary judgment, defending the validity of the "special assessment" and

asserting plaintiff's challenge of it was time-barred.  Plaintiff opposed the Borough's motion, again moved for summary judgment, and moved for reconsideration of the October 30, 2020 orders.

After hearing argument, the judge, in a decision placed on the record, held again that plaintiff was obligated under the Lease to pay all special assessments, including the repayment obligation labeled in the Financial Assistance Agreement as a "special assessment."  The judge also found plaintiff's challenge to the "special assessment" was time-barred and apportioning the entire assessment to plaintiff was not "inappropriate."[6]

In May 27, 2022 orders, the judge denied plaintiff's summary-judgment and reconsideration motions and granted the Borough's motion.  In a June 7, 2022 order, the judge granted the Landlord defendants' cross-motion for summary judgment and ordered plaintiff to pay the "special assessment" imposed in the Financial Assistance Agreement.  The judge entered a

---

[6] Neither the Financial Assistance Agreement nor the Resolution authorizing its execution apportioned the entire assessment to plaintiff or the Leased Premises. To the contrary, both the Financial Assistance Agreement and the Resolution provided the "special assessment" was on "the Property," which was described in both documents as having two lots, one lot for a "gasoline filling station and convenience store" and another lot for a "retail restaurant."

"supplemental order" on June 27, 2022, requiring plaintiff to pay the Landlord defendants' attorney fees and costs, totaling $214,831.09.

On appeal, plaintiff argues, among other things, the motion judge erred in finding plaintiff had a contractual obligation to pay the "special assessment." We agree.

## II.

We review a grant or denial of summary judgment de novo, applying the same standard as the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). That standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). We do not defer to the trial court's legal analysis or statutory interpretation. RSI Bank v. Providence Mut. Fire Ins. Co.,

234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014). We review a trial court's order on a reconsideration motion under an abuse-of-discretion standard. Branch, 244 N.J. at 582.

The question at the heart of this appeal is whether plaintiff is contractually responsible under the Lease for the repayment obligation BURR incurred in the Financial Assistance Agreement. Our analysis of that issue is guided by "familiar rules of contract interpretation." Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 615 (2020) (quoting Serico v. Rothberg, 234 N.J. 168, 178 (2018)).

"It is well-settled that [c]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." Id. at 615-16 (quoting In re County of Atl., 230 N.J. 237, 254 (2017)) (alteration in original) (internal quotation marks omitted). "The plain language of the contract is the cornerstone of the interpretive inquiry; 'when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result.'" Id. at 616 (quoting Quinn v. Quinn, 225 N.J. 34, 45 (2016)). "Contracts should be read 'as a whole in a fair and common sense manner.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99,

118 (2014) (quoting <u>Hardy ex rel. Dowdell v. Abdul-Matin</u>, 198 N.J. 95, 103 (2009)). "If we conclude that a contractual term is ambiguous, we 'consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation.'" <u>Barila</u>, 241 N.J. at 616 (quoting <u>County of Atl.</u>, 230 N.J. at 255). "In a word, the judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the express general purpose." <u>Ibid.</u> (quoting <u>Owens v. Press Publ'g Co.</u>, 20 N.J. 537, 543 (1956)).

Applying those rules of interpretation, we are convinced plaintiff is not contractually responsible under the Lease for BURR's repayment obligation under the Financial Assistance Agreement. The Lease expressly requires the Landlord, at its expense, to obtain the Landlord's Approvals and to complete the Landlord's Work. Holding plaintiff responsible for BURR's repayment obligation would render meaningless those provisions of the Lease. A review of the budget attached to the Financial Assistance Agreement confirms that conclusion.

The budget identifies "the costs and expenses for the portion of the Project to be funded from the Borough Financing" to be provided to BURR pursuant to

24

the Financial Assistance Agreement. The budget includes "NJDOT PERMIT/INSPECTION FEES," "NJDOT ESCROW FEES," and "NJDOT BOND" for a total of $245,446. Yet, paragraph (a)(v) of Section 7 of the Lease defines "Landlord Approvals" as "all approvals necessary to perform Landlord's Work and to allow Tenant to submit architectural plans for building permits for Tenant's Use . . . ." and includes "all New Jersey Department of Transportation ('DOT') and local highway occupancy permits for the construction of . . . all work within the public rights of way of the adjacent public streets." The budget includes "PSE&G POLE RELOCATION" for $356,000. Yet, paragraph (a)(iii) of Section 7A of the Lease includes as Landlord's Work "[r]elocation or removal of public and private utility lines, poles, or facilities within or outside of the Leased Premises, including without limitation, PSE&G . . . ." The budget includes "SITE CLEARING AND DEMO" and "SOIL EROSION CONTROL" for a total of $61,870. But paragraphs (a)(i) and (a)(ii) of Section 7A of the Lease include as Landlord's Work "[c]learing and rough grading of the Leased Premises" and "[e]rosion and sediment control of the Leased Premises." The budget includes "STORM" for $150,000. But paragraph (a)(iv) of Section 7A of the Lease provides the "Landlord shall be responsible for installing the initial

25

onsite storm water management quality and quantity control systems to the extent shown on the final Land Development Plans."

To hold plaintiff responsible for BURR's repayment obligation would impose on plaintiff the costs of Landlord's Approvals and Landlord's Work that plaintiff and the Landlord expressly agreed in the Lease would be the Landlord's sole responsibility. Thus, pursuant to Sections 7 and 7A of the Lease, plaintiff cannot be held responsible for Burr's repayment obligation under the Financial Assistance Agreement.

We are equally convinced that Section 11 of the Lease does not make plaintiff responsible for BURR's repayment obligation. Under paragraph (a) of Section 11, the "Tenant shall pay to the applicable taxing authority all real estate taxes and assessments that may be levied, assessed or charged against the Leased Premises by any governmental authority." Even using the "special assessment" term with which BURR and the Borough chose to label the repayment obligation, the "special assessment" created by those parties in the Financial Assistance Agreement was not "levied, assessed or charged against the Leased Premises." (Emphasis added). Paragraph 12 of the Financial Assistance Agreement specifies that the repayment obligation "is a special assessment and a lien on the Property." "Property" was defined as both "Lots 1 & 2." Thus, it

was designated as a "special assessment" against the Property as a whole, not the Leased Premises. Because it was not an assessment against the Leased Premises, plaintiff did not have an obligation under Section 11 to pay it.

Had it been a "special assessment" against the Leased Premises, plaintiff, under the express language of paragraph (b) of Section 11 of the Lease, had the right to contest the validity of the assessment and the Landlord had the obligation to "execute and deliver to Tenant whatever documents may be reasonably necessary or proper" for plaintiff to contest it. The Landlord admittedly did not provide that notice to plaintiff or deliver any such documents, not even the Financial Assistance Agreement that purportedly created the "special assessment," to plaintiff. If the "special assessment" had been an assessment against the Leased Premises, surely the Landlord defendants would have complied with their obligation.

And there may have been reason to contest validity of the "special assessment." In paragraph 12 of the Financial Assistance Agreement, which is the paragraph labelling the repayment obligation a "special assessment," BURR and the Borough acknowledged and agreed the acceptance of the Borough Financing was "a benefit for municipal improvements pursuant to N.J.S.A. 54:5-7 and N.J.S.A. 40:56-21." N.J.S.A. 40:56-21 provides:

> All assessments for benefits for local improvements under this chapter shall be made by the officer or board charged with the duty of making general assessments of taxes in the municipality, except where there is provided by law a board for the making of all such assessments, in which case all assessments shall be made by such board.
>
> The governing body of every municipality in which no board is provided by law for the making of all assessments for benefits accruing from local improvements may by ordinance create a general board for that purpose, which board shall thereafter make all such assessments.

The parties dispute whether the procedures required in N.J.S.A. 40:56-21 and in related statutes, see, e.g., N.J.S.A. 40:56-22 to -27 were followed and, thus, whether the "special assessment" purportedly created in the Financial Assistance Agreement was legally valid. But, we do not need to reach or decide that issue given our conclusion plaintiff was not contractually responsible under the Lease for the repayment obligation BURR incurred in the Financial Assistance Agreement.

The motion judge erred in finding plaintiff was contractually responsible for BURR's repayment obligation. Consequently, he erred in the October 30, 2020 orders in granting the Landlord defendants' initial cross-motion for summary judgment and in denying in its entirety plaintiff's initial summary-judgment motion.

Considering de novo plaintiff's motion, we conclude the judge should have granted the motion as to the first count, in which plaintiff sought a judgment declaring it is not contractually obligated under the Lease to make payments due under the Financial Assistance Agreement. Because Barrington Redevelopment submitted an invoice to plaintiff requiring plaintiff to pay for part of the Landlord's Approvals and Landlord's Work contrary to Sections 7 and 7A of the Lease and plaintiff paid that invoice, the judge should have granted plaintiff's motion as to the second count (breach-of-contract claim) as to Barrington Redevelopment. See Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 512 (2019) (setting forth the elements of a breach-of-contract claim). Given the finding of a breach of contract and that plaintiff's implied-covenant claim was based on the same contract and sought the same damages, the judge should have denied plaintiff's motion as to the third count (implied-covenant claim). See Wade v. Kessler Inst., 172 N.J. 327, 344 (2002) (holding a defendant who has breached a "literal" contractual term cannot "be found separately liable for breaching the implied covenant of good faith and fair dealing when the two asserted breaches basically rest on the same conduct"). We do not address plaintiff's remaining causes of action because plaintiff did not brief them. See N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super.

501, 505 n.2 (App. Div. 2015) (finding "[a]n issue that is not briefed is deemed waived upon appeal").

In sum, as to the first and second counts of the complaint we reverse the October 30, 2020 order granting the Landlord defendants' cross-motion for summary judgment and the October 30, 2020 order denying plaintiff's summary-judgment motion. We vacate all subsequent orders, including the July 9, 2021 order denying plaintiff's summary-judgment motion and giving plaintiff leave to amend its pleadings, because the judge should have granted plaintiff's summary-judgment motion as to the first and second counts of the complaint in the October 30, 2020 order, thereby rendering unnecessary the subsequent proceedings. We remand the case to the trial court and direct the court to issue an order granting plaintiff's initial summary-judgment motion filed on October 2, 2020, as to the first and second counts of the complaint, with a declaration as to the first count that plaintiff is not contractually obligated under the Lease to make payments due under the Financial Assistance Agreement and entering judgment in favor of plaintiff in the amount of $391,145.72 plus interest, if any, to which plaintiff may be legally entitled.

Reversed in part, vacated in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3566-21